**In the Interest of A.M.C. and P.R.C., Children**

No. 10–98–234–CV.

Court of Appeals of Texas, Waco.

Sept. 22, 1999.

Stanley Rentz, Lynnan L. Kendrick, Attorney ad Litem, Waco, for appellant.

John W. Segrest, Criminal District Attorney, Amy I. Forrester, Assistant District Attorney, Waco, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

GRAY, Justice.

This is a parental rights case. Two governmental agencies had different recommendations as to what was in the best interest of the children. Termination was sought by the Texas Department of Protective and Regulatory Services after approximately two years of working to improve the situation of the children in their home. Mental Health and Mental Retardation, although not directly representing the mother's interest, wanted to return the children to the home and to continue their work with the mother. After a four day trial, the parental rights to two children of a single mother were terminated. We must determine if the evidence was factually sufficient to sustain the verdict by the jury to terminate the parent-child relationships. Because we hold that the evidence was factually sufficient for the jury to conclude that termination was proper, we will sustain the verdict and affirm the judgment.

### OVERVIEW OF THE TRIAL PROCESS

Pursuant to a petition filed by the Texas Department of Protective and Regulatory Services, ("DPRS"), after a jury trial, Adyadet Cabret's rights were terminated regarding her minor children. The parent-child relationships were terminated based on the grounds that: (1) Cabret had either (a) engaged in conduct or knowingly placed her two children with persons who engaged in conduct which endangered the physical or emotional well-being of the children, or (b) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children, and (2) termination was in the best interest of the children. TEX. FAM. CODE ANN. § 161.001(1)(D),(E), & (2) (Vernon 1997). Cabret filed a motion for new trial which was denied. She perfected her appeal bringing one issue for this court to consider: that the trial court

erred in rendering judgment on the verdict and in overruling the motion for new trial. She claims the evidence was factually insufficient to support the jury's affirmative answers to the question of whether the parent-child relationships should be terminated.

## BACKGROUND

Cabret is twenty-four years of age with mild retardation. At the time of trial, she lived in public housing, had held five jobs in five years, and had made several attempts to commit suicide which resulted in hospitalization. The children, A.M.C. and P.R.C. were living in foster care at the time of trial. The children are from two separate fathers who did not stay with Cabret upon learning that she was pregnant. They are not parties to this action.

The initial investigation of the home-life of the children began in January of 1996, when DPRS received a report that Cabret's brother slapped 5 month old P.R.C. While the investigation was ongoing, another report was received in February that Cabret slapped A.M.C. An investigative report indicated that A.M.C. had elevated levels of lead in her blood. A DPRS family preservation caseworker was assigned to the case in February of 1996.

The caseworker made nearly 50 visits to the home of Cabret and her two children. During this time, A.M.C. was diagnosed with severe eye problems. Her doctor prescribed glasses to be worn by the child at all times and a patch to be worn for a certain amount of time each day. The doctor testified that failure to wear the patch could lead to blindness. Cabret was told of the condition, but did not fully comply with the instructions regarding either the glasses or the patch.

While the caseworker continued to work with Cabret, A.M.C.'s lead levels increased.[1] In August 1996, a report was received that A.M.C. had been walking in the middle of traffic on North 17th Street, in Waco. At the time, A.M.C. was two and one-half years of age. Upon further investigation, the caseworker learned that A.M.C., apparently unsupervised, had wandered out of the house on several occasions. One of the case workers urged Cabret to secure the house. Eventually, Cabret placed safety locks on the doors.

Cabret has had ongoing treatment for depression. She has been admitted to the hospital two or three times for suicidal tendencies.

In January of 1997, DPRS removed the children from the home, citing the possibility of harm to the children and permanent blindness of A.M.C. as the primary basis for this action. The case was transfered to a DPRS conservatorship caseworker in February of 1997. The caseworker reported very little improvement in Cabret's parenting skills during the time the conservator worked on the case. Two months prior to trial, Cabret threatened to kill herself if her children were not returned to her. A caseworker intervened and she was admitted to the hospital.

## THE TWO PRONG TEST FOR TERMINATION OF PARENTAL RIGHTS

■ The natural right existing between parents and their children is of constitutional dimension. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). The termination of parental rights involves fundamental constitutional rights. *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972). A termination decree is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. *Holick,* 685 S.W.2d at 20. Termination is a drastic remedy and is of such weight and gravity that due process requires the peti-

---

1. The caseworker determined that the rise of lead levels was due to the fact that the children were eating paint chips and that the surfaces of their toys were often covered with paint chips, because Cabret would not routinely wash the toys.

tioner to justify termination by "clear and convincing evidence." *Spangler v. Texas Dept. of Protective and Regulatory Services,* 962 S.W.2d 253 (Tex.App.—Waco 1998, no pet.). Cabret does not challenge any aspect of these proceedings on constitutional bases. Her complaint is that the evidence is insufficient under the applicable statute and our standard of review.

■ In proceedings to terminate the parent-child relationship brought under Section 161.001 of the Family Code, the petitioner must establish two elements. First, petitioner must prove one or more acts or omissions enumerated under the first subsection of the statute. *Richardson v. Green,* 677 S.W.2d 497, 499 (Tex. 1984). Second, petitioner must prove, that termination of the parent-child relationship is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (Vernon 1994); *Richardson,* 677 S.W.2d at 499. Both elements must be established, with regard to each child, and proof of one element does not relieve the petitioner of the burden of proving the other. *See Holley v. Adams,* 544 S.W.2d 367, 370 (Tex. 1976); *Wiley v. Spratlan,* 543 S.W.2d 349, 351 (Tex.1976).

## STANDARD OF REVIEW ON APPEAL

■ Termination of parental rights requires the petitioner to justify termination by clear and convincing evidence of each element. *In re G.M.,* 596 S.W.2d 846, 847 (Tex.1980); *Spangler,* 962 S.W.2d at 257. This standard is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Texas law requires this Court to determine if the trial court adhered to the clear and convincing standard of proof. *Spangler,* 962 S.W.2d at 257; *Baxter v. Texas Dep't of Human Resources,* 678 S.W.2d 265, 267 (Tex. App.—Austin 1984, no writ).

■ We set forth the standard of review in termination of parental rights in

*Spangler v. Texas Dept. of Protective and Regulatory Services.* Where the trier of fact is required to make a finding by clear and convincing evidence, the court of appeals will sustain a point of error alleging insufficient evidence if the trier of fact "could not reasonably find the existence of the fact to be established by clear and convincing evidence." *Spangler,* 962 S.W.2d at 257. This court must still determine whether the evidence at trial was factually sufficient to support a finding of clear and convincing evidence. *Id.* In a case where the burden is by clear and convincing evidence, an insufficient evidence point may be sustained when: (1) the evidence is factually insufficient to support a finding by clear and convincing evidence; or (2) a finding is so contrary to the weight of contradicting evidence that no trier of fact could reasonably find the evidence to be clear and convincing. *Id.; In the Interest of L.R. M.,* 763 S.W.2d 64, 67 (Tex.App.—Ft. Worth 1989, no pet.).

## THE EVIDENCE AT TRIAL

Because of the serious and permanent ramifications of the termination of parental rights, we will review the testimony of the witnesses at trial in an effort to assist the parties in understanding the result. It is this testimony that causes us to believe the burden of clear and convincing evidence has been met by the State.

### Adyadet Cabret

Cabret testified that her brother had hit her, her grandfather, and her children in the past. Initially, she stated that she would not allow him near her children anymore, but later testified that he could come to live with her when he returned from the Texas Youth Correctional Facility where he was currently in custody. She further testified that she had contemplated suicide five times in the last three years and had been admitted to the hospital at least two times for such thoughts. She admitted that A.M.C. had wandered out of the house on at least three occasions, including a time where she was found in the

middle of a busy street with traffic backed up in order to avoid hitting the child. She states that she did not place safety locks on her doors until her case worker told her to do so, though she thought about doing so sometimes.

Cabret admitted that she was aware of the necessity that A.M.C. wear her glasses everyday and also that she wear her eye patch several hours per day. She acknowledged that she was aware that A.M.C. might go blind if measures where not taken to prevent further damage to A.M.C.'s vision. When confronted with accusations by case workers that she had not made A.M.C. wear her glasses or patch as required, she repeatedly denied any failure whatsoever. She did admit that she waited to have the child's eye glasses repaired on several occasions. When questioned about the lead problems in her house, she testified that she did not know that the children were putting lead paint chips into their mouths, but that she was doing everything she could to prevent problems.

Finally, Cabret testified that the children had some problems with head lice which she tried to get rid of with special shampoo. She admitted that at the time the children were taken away they had not been taught how to eat age-appropriate table foods; that the children learned to eat age-appropriate food from their foster care family; that A.M.C. could only say five words even though she was over three years of age; and that P.R.C. had burned himself on very hot oatmeal. She stated that she had attended 23 of 28 parenting classes to learn to control her anger and be a better parent. She also admitted that she had lost her temper within the past week at a scheduled visitation, which resulted in her cussing and forcefully throwing a toy across the room.

*Dr. Russell Swann*

Dr. Russell Swann, the opthamologist who treated A.M.C., testified that he first started seeing A.M.C. in May of 1995. After a few visits, he diagnosed her with amblyopia: a condition which can lead to severe visual deterioration or even blindness if not treated during early stages of development. Dr. Swann did not specifically remember warning Cabret as to the effect of failing to follow his instructions, but stated that it is standard procedure in his office that the nurse make certain that patients understand what is necessary.

*Carmen Auffant*

Carmen Auffant, a family preservation caseworker for the DPRS testified as to her involvement with the Cabret family. Auffant visited Cabret's home approximately 50 times, sometimes visiting twice per week. At each visit, she examined the children for bruises or marks and never found any on either child. She testified that from March 1, 1996 until late May, A.M.C. did not have her glasses on at any visit and that Cabret attempted to justify this fact by saying that the glassed were being fixed, that she could not find the glasses, or that A.M.C.'s eyes were not very bad. Auffant cautioned Cabret about the risk to A.M.C.'s vision and stressed the importance of wearing the glasses. According to Auffant, when the child finally wore her glasses in late May, she did so without complaint and without removing them. Auffant testified that when the glasses would break, Cabret would wait months to have them fixed and would refuse transportation to the repair shop.

Auffant recommended that the children be placed in protective day care in order to minimize their exposure to the lead paint chips and dust which permeated the home, as well as to avoid exposure to Cabret's brother, John Kano, whom she described as an abusive person. The agency had received independent reports of Kano abusing the children. This action was also taken to provide Cabret with the opportunity to have a break in her day and to learn to improve her parenting skills. According to Auffant, Cabret often did not send the children to day care and their lead levels increased. Auffant stated that to prevent the children from being exposed

to lead paint in their home, she arranged to have Cabret's home repainted for free, but Cabret refused.

In September and October of 1996, Auffant took Cabret to have the glasses fixed and to buy a patch for A.M.C. to wear over her eye as prescribed by the doctor. It was at this time that P.R.C. sustained a burn on his arm from very hot oatmeal placed in front of him by Cabret. Auffant spoke with Cabret about the importance of checking the temperature of food before placing it in front of her children.

Auffant testified that in November, Cabret appeared to be doing very well and was beginning to "do things for the children." At this time, Auffant describes feeling proud of Cabret and thought that she might be "coming around."

Several changes took place in December, including the fact that the eye doctor now required that A.M.C. wear the patch four hours per day rather than two hours per day. Cabret would not make A.M.C. wear the eye patch. Cabret also refused to participate in the speech therapy designed for the children which required her participation in order to gain results.

Auffant explained that though progress would sometimes be made, Cabret would "go back to square one" and resist assistance. She describes Cabret's attitude toward intervention and parenting improvement as apathetic and explained that services for depression were offered very early in the intervention. She describes the relationship of Cabret and her children as having a bond without attachment. As an example, she describes an interaction she witnessed while attending a language skills session in the home. The instructor taught A.M.C. to say "bye, bye." A.M.C. was very excited and she repeated the word over and over. Auffant testified that Cabret told her to "Shut up, you're getting on my nerves," whereupon the child remained silent for the remainder of the visit. It was Auffant's opinion that Cabret actually discouraged the children from developing their language skills.

In December, after speaking with the doctor's office, Auffant became convinced that A.M.C. was now at high risk for losing her eye sight in one eye. Auffant, and DPRS decided to seek temporary custody of the children in February of 1997.

### Catie Capp

Once the children were removed from Cabret's immediate care, the case was transferred to Catie Capp, a conservatorship caseworker with the DPRS. Capp worked with Cabret to develop a Family Plan of Service designed to address the problems which led to the removal of the children from Cabret's care.

The plan required that Cabret become employed in order to support her children. Capp stated that Cabret had obtained some work, but unemployment had been the norm. Capp testified that Cabret refused to pursue job training services available at the Rehabilitation Center.

Bimonthly one hour visitation was also a requirement of the plan. Cabret almost never missed a chance to visit with the children. Capp describes the parent-child interactions as that of peer-to-peer rather than parent-to-child. During visits, Capp witnessed Cabret slapping or hitting A.M.C. as a form of discipline even though corporeal punishment is prohibited at the visitation center.

Other requirements of the plan included taking her medication, finding suitable housing which contained no lead paint, attending individual counseling, and attending and making progress in parenting classes. These goals were attempted and were completed to varying degrees, though Capp was made aware by other workers on the case that there was no progress in the parenting classes. It was Capp's belief that returning the children to Cabret would be hazardous and risky.

### Dr. James N. Shinder

Several doctors of various types were involved in the plan worked out with Ca-

bret. Dr. James N. Shinder, a Ph.D. in psychology, initially evaluated Cabret after the children were removed from the home. He asked that she attend group parenting classes, an anger management class, and individual therapy. All services were provided by CPS (Child Protective Services) and related agencies. Cabret had spotty attendance in all classes and sessions.

Shinder testified that in his opinion, there was no benefit in returning the children to their home, while there were certainly high risks. He based his opinion on 25 years of experience, working directly with Cabret in parenting classes, the testing and evaluations he performed with Cabret, and on conversations he had with Cabret concerning her interactions with her children. As an example of a number of disturbing events he recounted as bases for his opinion, he relates a time where Cabret admitted to calling her children hurtful names, such as "idiot," "stupid," and "dumb." Further, he describes Cabret as having the conscience of a child from three to four years of age and an intelligence quotient of 65, which is in the bottom one percentile for adults. Finally, Shinder testified that the difficulties experienced with Cabret and A.M.C. would likely be "carbon copy" for P.R.C. because she is unable to manage behavioral difficulty without losing her temper and slapping the child.

### Dr. David H. Beyer, Jr.

Dr. David H. Beyer, Jr., a medical doctor with Mental Health Mental Retardation ("MHMR"), testified that he met with Cabret periodically during the time that her children were in foster care. His initial meeting with Cabret led to her admission to the hospital due to suicidal thoughts. According to his testimony, Cabret reported having auditory hallucinations in which she heard the voices of her dead mother and dead grandmother. He testified that her medication had been changed several times and that she had ultimately stabilized with regard to her medication. Though she had been admit-

ted at least twice for suicidal thoughts, and reported several suicide attempts, Dr. Beyer concluded that in his opinion she would be able to raise her children with the help of MHMR and other agency services. On cross examination he admitted that her failure to follow doctor's instructions concerning the care of A.M.C.'s eye would give him some concern. As one doctor in a series of several doctors and case workers, Dr. Beyer expressed surprise when confronted with the facts of the eye condition and the child's repeated incidences of wandering out of the house.

### Dr. AliceAnne Brunn

Dr. AliceAnne Brunn, a Ph.D. in psychology, testified that she had performed psychological testing on Cabret in March of 1996, to determine whether she should receive counseling. Brunn diagnosed Cabret as a person with borderline intellectual functioning with major depression. Brunn suggested drug treatment by a psychiatrist. Brunn stated that she had concerns about whether Cabret was functioning in a coherent and rational way. Brunn recommended that Cabret not receive individual counseling, but did recommend that she be provided with more supportive services such as a support person to orient her and teach her how to care for her children.

### Dr. Richard Brunn

Further testing was performed on Cabret in March of 1997 by Dr. Richard Brunn, a Ph.D. in clinical psychology. Brunn's tests revealed an intelligence quotient of 72. He explained that anything below 70 qualifies the person as mentally retarded, while the range between 70 to 79 is considered borderline. It was his opinion that Cabret operated on the level of a third or fourth grade child. However, Brunn also testified that in his opinion, Cabret's life was starting to come together in terms of the services that were being provided for her. He testified that he wanted to give her more time to see if she could now make rapid progress and succeed enough to be able to take care of her

children. He also admitted that his opinion was based upon talking with Cabret rather than direct observation. Finally, he stated that he had no way of knowing when, if ever, Cabret would improve enough to care for her children.

## Carol Duron

Carol Duron, a Diamond Shamrock employee, testified that she and a co-worker saw a child in the street on the night of June 30, 1996. They picked her up, brought her into the store, and called the police. Duron stated that she "knew the child" as A.M.C. from having seen her in the store with Cabret. Duron testified that the child was not wearing glasses at the time of the incident. She also testified that on another occasion Cabret came into the store looking for A.M.C.

## Jessie Guardiola

Jessie Guardiola, a supervisor with the DPRS, testified that he met with Cabret on several occasions, oversaw her case and her Service Plan, and that he was involved in the decision to seek termination of her parental rights. Guardiola stated that the decision to seek termination was based on a variety of factors, including all the facts as a whole, the progress of the parties involved, the input from the guardian ad litem, and direct observation of Cabret with her children. He discussed the future options for the children in the event that the rights of Cabret were terminated. In his testimony, he stressed the importance of a permanent and reliable placement for the children. It was his opinion that the children were highly adoptable.

## Diane Lawrence

A social worker with MHMR, Diane Lawrence, testified that she helped Cabret gain admission to the hospital when she was suicidal. Lawrence visited Cabret sixteen times over a period of several months. Her opinion was that the parent-child relationship should not be terminated. She based her opinion on conversations she had with Cabret. She admitted that Cabret did not tell her about A.M.C. wandering into the street, nor about her own abusive childhood. From conversations with Cabret, Lawrence felt that Cabret benefitted by attending parenting classes and had learned to take care of her children. Lawrence observed Cabret with her children on one occasion for ten minutes. Lawrence felt that she could conclude that Cabret had gained control of her temper.

## Margret Messer

Margret Messer, a social worker with MHMR, testified that she had initial contact with Cabret when she came to MHMR. Messer had continued to provide support services up to the time of trial. She testified that since her initial entry into MHMR, Cabret had made continuous improvement and had obtained clean, affordable housing. It was also her testimony that she had observed Cabret with her children during visitation and that the children and their mother were very emotionally attached. She reported that Cabret comforted P.R.C. when he fell down. She also reported that she saw A.M.C. hug and caress her mother when they embraced. It was her testimony that Cabret loves her children, that she has worked hard to regain them, and that she could learn the proper parenting skills required to properly care for them. Such skills could be taught to her through a program available at MHMR. She believes Cabret to be a kind and caring individual with a very gentle disposition.

## Jennifer Edwards

The guardian ad litem called as a witness Jennifer Edwards, a Court Appointed Special Advocate (CASA). Edwards testified that her role in CASA requires that she enter the temporary foster home to bond with the children and observe the children in the foster home. Edwards also attended the majority of visits made by Cabret to the children. She observed Cabret lose her temper several times during visitation. It was her opinion that the children had no bond with their mother.

*Kathryn Compton*

Kathryn Compton, the foster parent to A.M.C. and P.R.C., testified that when the children first came into her home, they were each very sick, had severe diaper rash, and were both infested with lice. It took three weeks to rid A.M.C. of her infestation because it was particularly severe. Their clothes were dirty and their belongings were infested with roaches. Though A.M.C. was three years of age, she knew only five words, was still in diapers, and still took a bottle. P.R.C. was two years of age, yet the children were developmentally at the same level. At the time of trial, both children were testing close to their own age level. Each of them had made rapid progress in programs provided to help them develop.

## APPLICATION OF THE TWO–PRONG TEST

As previously discussed, termination of parental rights requires that the trier of fact make a finding by clear and convincing evidence. *Spangler,* 962 S.W.2d at 257; *In re G.M.,* 596 S.W.2d at 847. Accordingly, the question is whether the jury could not reasonably have found the existence of the fact to be established by clear and convincing evidence. *Spangler,* 962 S.W.2d at 257. At trial, the jury was required to find, by clear and convincing evidence, that: (1) Cabret either (a) engaged in conduct or knowingly placed the children with persons who have engaged in conduct which endangers the physical or emotional well-being of the children; or (b) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children, and (2) termination of the parent-child relationship is in the best interest of the children. TEX. FAM. CODE ANN. § 161.001(1)(D),(E), & (2) (Vernon 1997). *Endangering the well-being of the children*

■■■ If the evidence shows a course of conduct on Cabret's part which either has the effect of endangering the physical

or emotional well-being of her children, or has the effect of showing that Cabret knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children, a finding under Section 161.001(1)(D)(E) will be upheld. *Texas Dep't of Human Services v. Boyd,* 727 S.W.2d 531, 534 (Tex. 1987). Cabret frequently failed to attend to the medical needs of A.M.C. when she did not require the child to wear her glasses and patch her eye. It is not necessary that the conduct of the parent be directed at the child or that the child actually suffer injury. *In re M.C.,* 917 S.W.2d 268 (Tex. 1996). Cabret has attempted and thought about suicide often. By her own testimony, she also admits that, unattended, A.M.C. wandered into a busy intersection. P.R.C. had burned himself on hot oatmeal. More significantly, even though her brother has struck P.R.C., she would allow her brother to come back into her home with P.R.C.

■■■ The opinions of doctors and social workers as to whether the rights of Cabret should be terminated is in conflict. While testimony by doctors and social workers from DPRS reveal a parent who is depressed, often stressed, and who frequently does not perceive danger to the children, the doctors and social workers from MHMR testify that Cabret had made substantial advances in both her personal difficulties as well as in her parenting skills. The case took place over a period of more than a year and Cabret received services from both agencies over a period of time. The evidence shows that there are times when she made progress in her ability to parent the children and evidence of bruises or marks were never found on either of the children. Dr. Breyer, Dr. R. Brunn, Diane Lawrence, and Margret Messer, of MHMR, all agreed that Cabret had made significant progress and wanted to give her more time to improve. Auffant and Capp, both caseworkers for DPRS, as well as Dr. Shinder and Guardiola, both of

DPRS, all stated that termination was best for the children. The jury heard the testimony of each of these persons and noted their demeanor and assessed their credibility. We note that the function of the jury, as the trier of fact, is to judge the credibility of the witnesses, assign the weight to be given their testimony, and resolve any conflicts or inconsistencies in the testimony. *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988); *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986).

Both children were exposed to lead based paint and their blood levels showed a steady increase of lead, yet nothing was done by Cabret to prevent such harm. The children were both developmentally behind when taken into custody. Further, the children were very sick, had lice, and severe diaper rash when they went into foster care. Finally, A.M.C. repeatedly left the house while under Cabret's care, which eventually led to the child wandering into traffic.

From this evidence the jury could have reasonably found that Cabret engaged in conduct which endangered the physical or emotional well-being of the children (sub-part (a) of the first prong) or that Cabret knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children (sub-part (b) of the first prong). Thus the first prong necessary for termination of Cabret's parental rights to both children is satisfied.

*Best Interest of the Child*

 Cabret argues that there is factually insufficient evidence to support the finding by the jury that the termination of the parent-child relationship was in the best interest of A.M.C. and P.R .C. An extended number of factors have been considered by the courts in ascertaining the best interest of the child. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex.1976). Included among these are the following: (A) the desires of the child; (B) the emotional and physical needs of the child now

and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *See Holley v. Adams,* 544 S.W.2d 367, 372 (Tex.1976).

After consideration of these factors and the evidence before the jury, we find that the evidence as a whole supports the jury's finding that the best interest of each child will be served by terminating Cabret's parental rights. *Holley,* 544 S.W.2d at 371–72. Specifically, the testimony of Edwards, the CASA worker, and of Compton, the foster parent, shows that the children have made rapid and consistent developmental progress in areas which had been severely deficient prior to their coming into the foster program. Additionally, Guardiola's testimony as to the options available for the children also supports the jury finding that termination was in the best interest of the children. Further, the jury could have considered the future well-being of the children in light of all the testimony and then reached their decision of the best interest of the children. Thus, the second prong necessary for termination of her parental rights is satisfied.

### JURY NOTE

 Cabret's brief points us to the fact that the jury requested permission to read a note to the court which was composed by the jury. The note stated, "We, the jury, unanimously agree that the outcome of this case would have been different had CPS given Ms. Cabret the support that she was entitled to from the very beginning. We know that Ms. Cabret loves her children and that she did the best that she

could to her ability." While the note from the jury illustrates that the jury felt emotional about their verdict, we note that the verdict was unanimous. That a jury does not enjoy severing the parent-child relationship is testament to the role of family ties for most of us in our culture. However, the note does not negate that the jury found the elements needed to terminate the relationship. In fact, it shows that the jury served its assigned function of reviewing the evidence presented and not allowing sympathy to impact their resolution of the facts. The verdict was based upon the evidence.

## CONCLUSION

Because the jury findings are supported by clear and convincing evidence and the judgment of the trial court is based upon those findings, we affirm the trial court's judgment terminating the parental rights of Adyadet Cabret to her children, A.M.C. and P.R.C.

Affirmed.