137 S.W.3d 814 (2004)
In the Interest of C.J.B., a Child.
No. 10-03-00009-CV.
Court of Appeals of Texas, Waco.
May 12, 2004.
*816 Nita Fanning, Attorney At Law, for Appellant/Relator.
*817 Kirsten M. Castaneda, Locke, Liddell & Sapp, L.L.P., Dallas, for Appellee/Respondent.
Lynnan L. Kendrick, Attorney At Law, Waco, Ad Litem.
Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.[*]

OPINION
TOM GRAY, Chief Justice.
C.J.B. was taken from Cheryl Billups shortly after his birth and placed in foster care. Cheryl was a drug and alcohol abuser. By the time C.J.B. was 19 months old, Cheryl convinced the Texas Department of Protective and Regulatory Services (the Department) that she was clean and sober and could take care of C.J.B. But she had deceived the Department. Cheryl was already drinking again when she regained custody of her child. In a little over three months, C.J.B. was again removed from Cheryl's custody.
Cheryl sobered up, but it was too late. The Department had decided it was not going to risk C.J.B.'s well-being. By the time of the trial, Cheryl had been sober, maintained a job, and maintained the same apartment for ten months.
Cheryl's parental rights to C.J.B. were terminated after a jury trial. She presents four issues for review. We affirm the trial court's judgment.

EXPERT TESTIMONY
In the summary of her argument, Cheryl contends that, but for Dr. Chieza's testimony, there is little evidence that termination was in C.J.B.'s best interest. Thus, we will address her second issue first where she argues that the trial court erred in admitting the testimony of Dr. Mercy Chieza without subjecting that testimony to a Daubert/Robinson[1] hearing to determine the validity of the opinions expressed by Dr. Chieza.
Before calling Dr. Chieza as a witness, counsel for the Department informed the court that she did not know whether an "expert hearing" would be necessary. Cheryl offered a stipulation that the doctor could "testify as a psychologist." The Department then acknowledged that "if the questioning gets outside that range, then there will be an objection to more expert qualifications." Dr. Chieza took the stand and began testifying. Soon thereafter, the Department offered the written report of Dr. Chieza's psychological evaluation into evidence. The following transpired:
MR. McCALL: I object. The proper predicate isn't laid. She's going to be testifying, so it's going to go cumulative. Part of this, I think, is inadmissible and has opinions that may not have sufficient basis.
THE COURT: I need to look at the exhibit. Doctor, if you'll pass me the exhibit.
MR. McCALL: There is hearsay also. THE COURT: Ladies and gentlemen, I'm going to have to make some evidentiary rulings here outside the presence of the jury. I'm going to recess you-all until I get that done. Remember the instructions. Do not discuss the case or allow anyone to discuss it with you. We'll call you back in a few minutes.
(Jury not present.)

*818 We're outside the presence and hearing of the jury. What was your specific objections, Mr. McCall, to State's Exhibit 2?
MR. McCALL: Proper predicate is not laid. It's not a business report. This is a report. It contains a lot of opinions in it rather than recording an after event, the after event like the doctor is going to record when they take somebody's history and write their diagnosis. It has a lot of impressions and things, numerous things I may object to individually as the question is asked, but it's also cumulative, if she's going to be testifying about what she did and what her diagnosis is.
THE COURT: This is a psychological evaluation of a child the subject of this lawsuit. Everybody has stipulated to this witness' qualifications and credentials as an expert in the field of psychology, so to that extent I'm overruling that objection. What other objection do you have?
MR. McCALL: Well, a lot of her impressions that she has on the last page, there is no mention whatsoeverthey need to be based on psychological probability if she's going to have an opinion on something, rather than where she says, "Sexualized behaviors that were reported by the foster mother suggest that CJ has either experienced sexual abuse, molestation or has witnessed live or onscreen sexual acts." A suggestion is not reasonable psychological probability. We're getting into a guessing game and speculation. Just the next sentence, "Other behaviors suggest existence of an emotional disturbance that support the notion that he was probably sexually abused in the past." We're getting way off on a limb when she doesn't have all of the
THE COURT: Well, she's an expert. She's entitled to use her experience and training and background in diagnosing this child and in explaining to the Court and the jury the basis for her findings. MR. McCALL: Well, if it's not a finding based on psychological probability, I'm going to object to it.
* * *
THE COURT: Well, I'm overruling the objection. What other objection do you have?
MR. McCALL: That was all my objections. I'm going to object anytime she tries to getI don't know if she's going to try to give an opinion on that or not.
* * *
THE COURT: All right. I'm going to admit the exhibit, if those are all the objections.
All right. Bring in the jury.
* * *
(Open court, jury present.)
THE COURT: I know youall thought you were going to be gone a long time. We fooled youall.
Okay. State's Exhibit Number 2 is admitted. Youall may proceed.
As can be determined from the above exchange, Cheryl's objections relate solely to the admissibility of Dr. Chieza's written report. Her complaint on appeal attacks the trial court's failure to hold a Daubert/Robinson hearing. As such, this complaint does not comport with the complaint raised before the trial court and presents nothing for our review. See TEX.R.App. P. 33.1; see also Texas D.O.T. v. Olson, 980 S.W.2d 890, 898 (Tex.App.-Fort Worth 1998, no pet.).
If Cheryl was attempting to request a Daubert/Robinson hearing, the request was not sufficient to inform the trial court of such request. To present a complaint for appellate review, the complaining *819 party must state the grounds for the ruling that it seeks with sufficient specificity to make the trial court aware of the complaint. TEX.R.App. P. 33.1(a). A specific objection is one which enables the trial court to understand the precise grounds so as to make an informed ruling, affording the offering party an opportunity to remedy the defect, if possible. McKinney v. National Union Fire Ins. Co., 772 S.W.2d 72, 74 (Tex.1989)(op. on reh'g). On this record, it cannot be inferred, particularly given the prior stipulation, that Cheryl was challenging, at that time, the expert nature of Dr. Chieza's opinions. Cheryl reserved objection to the doctor's opinions if she later testified to any. Cheryl, ultimately, did not object to Dr. Chieza's opinion testimony. Again, Cheryl's issue presents nothing for review.

LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE OF BEST INTEREST
In her fourth issue, Cheryl argues that the evidence was legally and factually insufficient to support a finding that termination of her parental rights was in the best interest of C.J.B.
LAW
Termination of parental rights requires an affirmative finding on each prong of a two prong test. One prong is that termination is in the best interest of the child, and each prong must be proved by the petitioner by clear and convincing evidence. In the Interest of J.M.T., 39 S.W.3d 234, 237 (Tex.App.-Waco 1999, no pet.); see also TEX. FAM.CODE ANN. § 161.001 (Vernon 2002). The evidence supporting a judgment terminating parental rights, is legally insufficient if, after a review "of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true." In re J.F.C., 96 S.W.3d 256, 266 (Tex.2002). In such a legal-sufficiency review, "a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." Id. In turn, "looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." Id. The court should disregard disputed facts, not supporting the finding, "that a reasonable factfinder could have disbelieved or found to have been incredible." See id. We do not "disregard all evidence that does not support the finding." Id.
When conducting a factual insufficiency evidence review, a termination finding must be upheld if, in light of the entire record, the evidence is such that a reasonable factfinder could form a firm belief or conviction that grounds exist for termination. In the Interest of C.H., 89 S.W.3d 17, 18 (Tex.2002); see also J.F.C., 96 S.W.3d at 266; In the Interest of A.M.C., 2 S.W.3d 707, 711 (Tex.App.-Waco 1999, no pet.). This standard that focuses on whether a reasonable factfinder could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role. C.H., 89 S.W.3d at 26. A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. J.F.C, 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. Id. A court of appeals should detail in its opinion why it has concluded that a reasonable factfinder could not have *820 credited disputed evidence in favor of the finding. Id.
But an appellate court's review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt. C.H., 89 S.W.3d at 26. While parental rights are of constitutional magnitude, they are not absolute. Id. Just as it is imperative for courts to recognize the constitutional underpinnings of the parentchild relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right. Id.
A number of factors have been considered by the courts in ascertaining the best interest of the child. Holley v. Adams, 544 S.W.2d 367, 372 (Tex.1976); A.M.C., 2 S.W.3d at 717. Included among these are the following: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. See Holley, 544 S.W.2d at 372; A.M.C., 2 S.W.3d at 717.
The dissent suggests section 263.307 of the Texas Family Code specifies the factors we must consider in conducting the legal and factual sufficiency review of whether termination is in the child's best interest. See TEX. FAM.CODE ANN. § 263.307 (Vernon 2002). But the factors considered in termination cases are broader than those mentioned in section 263.307, which is limited to the factors considered when "determining whether the child's parents are willing and able to provide the child a safe environment ...." Id. (b). Many, if not all, of the thirteen factors listed in section 263.307, one with six subparts, are subsumed within one of the broader Holley factors.
Further, neither the Texas Supreme Court, nor this Court, has ever held that the Holley factors are exhaustive, or that all such considerations must be proved as a condition precedent to parental termination. C.H., 89 S.W.3d at 27; see also In re C.N.S, 105 S.W.3d 104, 106 (Tex.App.-Waco 2003, no pet.). The absence of evidence about some of these considerations does not preclude a factfinder from reasonably forming a firm belief or conviction that termination is in the child's best interest. Id. The analysis of one factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. In the Interest of J.M.T., 39 S.W.3d 234, 240 (Tex.App.-Waco 1999, no pet.).
EVIDENCE
Because Cheryl challenges the sufficiency of the evidence on the determination of best interest of the child, We review the evidence in relation to each of the Holley factors. The parties have not identified, briefed, or argued any other factors which we should consider.

A. THE DESIRES OF THE CHILD.
At the time of trial, C.J.B. was three years old. There is no direct evidence that he ever expressed, or was ever asked, what he wanted. There was evidence, however, that he had not formed a close bond with Cheryl. Cheryl admitted that the bond between C.J.B. and his paternal aunt, Belinda Honey, was stronger. She thought that with time, she and C.J.B. could reestablish their bond.

*821 B. THE EMOTIONAL AND PHYSICAL NEEDS OF THE CHILD NOW AND IN THE FUTURE.
The majority of the testimony relevant to the Holley factors falls within this category.

Krista Kumahata
Krista became C.J.B.'s foster mother when he was 9 months old. He remained with her until he was placed back with Cheryl in February of 2001. Krista regained care of C.J.B. in July of 2001, and he remained with her for a year until a move to Houston forced Krista to give up C.J.B. When C.J.B. returned to Krista's home, he did not have the same "sparkle" as before; he had more of an inner sadness. Krista thought he had not grown developmentally since he had been gone. C.J.B. started hiding food in his pockets. He ate constantly. He took things, like his baby bed, apart. He was clingy. He would take all his sheets and blankets off his bed and sleep on just the mattress. Krista also became concerned that C.J.B. was not always mentally "with you." Krista admitted that she never considered adopting C.J.B. because she felt that her family could not give him the attention he needed. Her church Sunday school had to add an extra worker just to watch C.J.B. Krista thought dedication to C.J.B. and training were necessary to take care of him.

Jeanie Cochrane
C.J.B.'s current foster-parent, Jeanie Cochrane, gained possession of C.J.B. in September of 2002. The first few weeks with C.J.B. were extremely difficult. He was excessively hyper and impulsive. A few weeks after his placement with Jeanie, C.J.B. began exhibiting what Jeanie thought was inappropriate sexual behavior. Because of C.J.B.'s behaviors and his inability to respond to discipline, Jeanie was hesitant about adopting him. She was concerned whether C.J.B. would be able to attach to anyone because he went to everyone. He hugs Jeanie, Cheryl, and his appointed attorney. But one-on-one, he does not want to make eye contact. Jeanie believed C.J.B. sabotaged any one-onone time. To Jeanie, C.J.B. had no response to pain. There were times that C.J.B. was not responsive to anything. The Mother's Day Out program at her church had to bring in extra help for C.J.B. If Jeanie adopted C.J.B., she stated she would have no other children. Jeanie surmised that an alcoholic or drug addict would have an even more difficult time taking care of C.J.B.

Dr. Mercy Chieza
Dr. Chieza, a psychologist, evaluated C.J.B. two months prior to trial for a potential referral for services. She diagnosed C.J.B. with overanxious disorder of childhood and recommended play therapy as a treatment.[2] Dr. Chieza was concerned that C.J.B. has either experienced sexual abuse or has been exposed to things like that in the past. She could not pinpoint when or where the traumatic event occurred. Although there had been no diagnosis of fetal-alcohol syndrome, she compared C.J.B.'s uncontrollable behaviors with those behaviors of children with fetalalcohol syndrome. Dr. Chieza recommended that C.J.B.'s caregiver begin treatment for him as soon as possible, because if his behaviors were not treated early, they would develop into major behavioral problems. Dr. Chieza contended that children with C.J.B.'s problems are a handful to raise and a parent can be overwhelmed. If a parent in recovery from alcohol abuse relapsed, the doctor was concerned *822 that the problems of the child would be reinforced.

Dr. Pamela Grossman
Dr. Grossman, a psychologist, is the current therapist for C.J.B. She had four therapy sessions with him over the month before trial. Through non-directive play therapy, Dr. Grossman diagnosed C.J.B. with post-traumatic stress disorder and reactive attachment disorder. She explained that post-traumatic stress disorder is an anxiety disorder that can occur right after trauma or can be significantly delayed after trauma. Often a child behaves in a disorganized, hyper manner and reenacts traumatic material from a traumatic event. In C.J.B.'s case, she believed he was re-enacting sexual behavior that he either witnessed or experienced. Dr. Grossman explained that children with reactive attachment disorder have trouble forming attachments or are too readily attached to others or have a combination of these characterizations. According to the doctor, C.J.B. was more detached from adults in a care giving role and was not as interested in selective attachments as other kids are. C.J.B. could be hoarding food because of either disorder. Dr. Grossman stated that children who have suffered severe neglect can have these behaviors.
Dr. Grossman believed C.J.B. would continue to need ongoing therapy at different times in his life based on the problems he had been experiencing. C.J.B. would need a lot of patience, consistency and structure. Dr. Grossman anticipated that more issues, especially in adolescence, would emerge. And C.J.B.'s behaviors would be stressful on the person raising him.

C. THE EMOTIONAL AND PHYSICAL DANGER TO THE CHILD NOW AND IN THE FUTURE
Belinda Honey believed that it would be detrimental to C.J.B. to be placed back with Cheryl. Her concern was that if Cheryl relapsed, she would not ask for help; she shuts everyone out.
Jesse Guardiola, a CPS supervisor, became very concerned for C.J.B.'s welfare after reading the report about the second removal. He believed C.J.B. could not protect himself, and he could not trust Cheryl to protect C.J.B. Jesse agreed that it would be a gamble to place C.J.B. with Cheryl again. He felt she would again be in contact with her former husband and C.J.B.'s father, Charles. Reunification was not an option because of Cheryl's past history arid because it did not appear that she had learned anything. Jesse no longer trusted Cheryl.
Dr. Chieza was concerned that if Cheryl relapsed, C.J.B.'s problems would be reinforced.

D. THE PARENTAL ABILITIES OF THE INDVIDUAL SEEKING CUSTODY.
There is no direct evidence of Cheryl's current parental abilities. However, several of her friends testified that she was good with their children.

E. THE PROGRAMS AVAILABLE TO ASSIST THESE INDIVIDUALS TO PROMOTE THE BEST ITEREST OF THE CHILD.
Certainly, if C.J.B. is in Cheryl's custody, any programs Cheryl attends to assist her recovery from substance abuse would promote the best interest of C.J.B. After her second 90 days in the Freeman Center, Cheryl followed the Center's aftercare recommendations. She attends meetings of Alcoholics Anonymous and Narcotics Anonymous, has a sponsor, and is on the fourth step of a twelve step program. Cheryl participates in individual counseling. C.J.B. also participates in therapy.

F. THE PLANS FOR THE CHILD BY THIS INDVIDUAL OR BY THE AGENCY SEEKING CUSTODY.
The Department's plan had been to keep C.J.B. in Krista Kumahata's home until a *823 permanent placement could be found. When Krista had to move, she had to give up C.J.B. He was placed in another home but that home did not have the potential to become permanent. He was then placed at Jeanie Cochrane's home where they would have the option to adopt C.J.B. if he became legally adoptable.
Cheryl planned to have C.J.B. reevaluated. Although she had not seen the behaviors the foster parents spoke of, she agreed that he needed therapy and his problems needed to be addressed. Cheryl had planned a daily routine for C.J.B. She had a daycare chosen for him across the street at a church. She had an insurance plan for him. Cheryl stated that she accepted her son for whatever problems he had and would work with a therapist to work through his problems.

G. THE STABILITY OF THE HOME.
Up until about ten months prior to trial, Cheryl's home life was unstable. Cheryl and Charles lived in a "shack" at the time C.J.B. was born. While C.J.B. was out of her care, Cheryl moved to Waco to be closer to Charles's family. C.J.B. remained in a hospital in Dallas. Cheryl and Charles moved in with Charles's sister, Belinda Honey. They moved out and lived in an apartment for 6 months and a motel for a week. After that, Cheryl was on the streets for about 2 weeks. She then entered the Freeman Center's "detox" unit for the first time and completed the 90 day program. She then moved in with friends until she could acquire an apartment of her own which she did. After Cheryl regained custody of C.J.B., Charles moved in with them. Within the month, she quit her job and began drinking daily. The day C.J.B. was removed again, Cheryl was arrested and taken to jail. After she was released, she checked into the Freeman Center for the second time. When she was discharged, she again lived with friends until she could move out into her own apartment. Since then, she had been in the same apartment and had the same job.

H. THE ACTS OR OMISSIONS OF THE PARENT WHICH MAY INDICATE THAT THE EXISTING PAENT-CHILD RELATIONSHIP IS NOT A PROPER ONE.
Although C.J.B. was only three at the time Cheryl's rights were terminated, Cheryl had an extensive history of acts or omissions which would indicate the parentchild relationship was not proper.
She abused alcohol and drugs, smoked during her pregnancy, and received no prenatal care. She was also arrested for theft during her pregnancy. While C.J.B. was still in the hospital in Dallas, Cheryl moved to Waco. After almost a year, Cheryl and Charles confessed that they had been lying to the Department for eight months. Charles then relinquished his parental rights and the Department began working with Cheryl. Cheryl admitted that she decided to fool the Department again. Even though the Department warned Cheryl to stay away from Charles, she decided she was going to hide her relationship with him and hide her continued use of alcohol. She chose Charles and her lifestyle over her child. Cheryl admitted that she relapsed but did not tell the Department of this relapse. She agreed that the relapse, less than three months before she was reunited with C.J.B., would cause a person concern whether she had C.J.B.'s best interests at heart. Closely supervising C.J.B. was not a priority when she was intoxicated.
Immediately prior to C.J.B.'s placement back with Cheryl, Belinda Honey suspected Cheryl of drinking. After Cheryl regained custody of C.J.B., Belinda noticed that on about ten occasions, Cheryl was intoxicated. Once, Belinda observed C.J.B. start to take a sip of beer that Cheryl had and Cheryl slapped it out of his hand, causing C.J.B. to fall to the *824 ground. On another day, she observed C.J.B. running around Cheryl's apartment with no diaper on and eating cereal off the floor that she had seen there the day before. On another day, Belinda saw Cheryl slap C.J.B.'s hand when he wanted to get down from eating in his high-chair to go over to Belinda.
Cheryl admitted to being intoxicated while C.J.B. was in her care but denied that he was in any danger. On July 5, 2001, Cheryl started drinking as soon as she woke up. She took C.J.B. to a friend's apartment where Cheryl and the friend continued to drink. The police were called. Several witnesses testified that C.J.B. was dirty that day. It appeared he had been wearing a diaper for a very long time. He had what appeared to be bite marks on his legs and a severe diaper rash. The bite marks were later diagnosed as scabies. The apartment where C.J.B. had been was trashy. Cheryl's apartment was infested with fleas. Neither Cheryl nor her neighbor were in any condition to take care of C.J.B. Cheryl again denied that C.J.B. was in any danger. Tenants of the apartment complex told the Department that Cheryl's neglect was not a one-time incident. All the information received about Cheryl from the tenants interviewed was negative.
Cheryl did not attend C.J.B.'s church dedication because she was not invited. On his first birthday, she had a one hour visit with him but did not bring him anything. She missed his second birthday because she was in jail. For his third birthday, she visited him two weeks later and brought him a watch.

I. ANY EXCUSE FOR THE ACTS OR OMISSIONS OF THE PARENT.
Cheryl blamed her neglect of C.J.B. on her alcoholism. She contended that she now took her need for sobriety seriously. Her counselor at the Freeman Center gave her an excellent prognosis for maintaining her sobriety. Her sponsor and several others who either worked at the Center or knew her as a fellow patient, believed Cheryl was committed to sobriety and to C.J.B. Her apartment was clean and orderly, even on surprise visits. In ten months, no one had detected any signs of Cheryl drinking again.
APPLICATION
Cheryl had a history of deceit toward the Department and neglect toward her child. C.J.B. would have continuing problems due to Cheryl's past neglect. After reviewing all the evidence in the light most favorable to the affirmative finding of best interest, we hold that a reasonable trier of fact could have formed a firm belief or conviction that termination was in the best interest of C.J.B. And, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination was in C.J.B.'s best interest.[3]
Cheryl's fourth issue is overruled.

VIOLATION OF "THE RULE"
In her first issue, Cheryl contends the trial court abused its discretion in allowing Belinda Honey to testify in violation of "the Rule." Specifically, she complains that Belinda and Amanda Honey, her daughter, discussed Amanda's testimony.
*825 Texas Rule of Evidence 614 and Texas Rule of Civil Procedure 267 (also known as "the Rule") provide for the exclusion of witnesses from the courtroom during trial. See TEX.R. EVID. 614; TEX.R. CIV. P. 267. The purpose of the rule is to minimize witnesses' tailoring their testimony in response to that of other witnesses and to prevent collusion among witnesses testifying for the same side. See Drilex Sys., Inc. v. Flores, 1 S.W.3d 112, 116 (Tex.1999); In re D.T.C., 30 S.W.3d 43, 49 (Tex.App.-Houston [14th Dist.] 2000, no pet.). The witnesses under the Rule generally may not discuss the case with anyone other than the attorneys in the case. Drilex Sys., Inc., 1 S.W.3d at 117. When the rule is violated, the trial court may allow the testimony of the potential witness, exclude the testimony, or hold the violator in contempt. Drilex Sys., Inc., 1 S.W.3d at 117; In re D.T.C., 30 S.W.3d at 49. We review the trial court's action for an abuse of discretion. Drilex Sys., Inc., 1 S.W.3d at 117-118.
Prior to opening statements, all the witnesses, except Cheryl and Jesse Guardiola, were placed under the Rule. The trial court instructed the witnesses not to discuss the case with anyone other than the attorneys. Amanda Honey testified during the first day of trial. Belinda testified the next day. But before she took the stand, Cheryl advised the court that she thought Belinda had violated the Rule. The following exchange took place between Belinda and Cheryl's attorney:
Q: You didn't discuss anything with your testimony or what [Amanda] was asked?
A: The only thing that she did say was that she started crying when she had to start talking about CJ.
Q: Did she say what was said and what was asked?
A: She said what condition he was in the day she went there and what the house looked like the day she went there.
Q: That's what she told you. Right?
A: Right. That was when we went home. It wasn't sitting here.
Q: It was when you went home, you talked about the case?
A: Uh-huh.
Q: And her testimony.
A: Uh-huh.
The court clarified what transpired between the two:
Court: All right. Let me get clear, Ms. Honey. What your daughter told you yesterday was that she got upset when she described the condition of the house and of the child on the day that the child was removed; is that correct?
A: Yes, sir. She said that when they asked her what condition it was in, she remembered about CJ screaming and crying when she was changing his diaper, and she saw a picture of CJ over here somewhere where they could see him, what it looked like today, and it upset her, and she started crying.
Court: And that's all she told you?
A: Yes, sir.
It initially appears Belinda and Amanda discussed Amanda's testimony, as in what was asked and what she said. However, after the court's clarification of what was discussed, it appears that the court could have reasonably believed Amanda only relayed her emotional response when recalling C.J.B.'s condition the day he was removed. The court did not abuse its discretion in allowing Belinda to testify. Cheryl's first issue is overruled.

*826 ARGUMENT ERROR

We now consider Cheryl's third issue where she contends the trial court erred in sustaining the Department's objection to Cheryl's closing argument. The court's charge to the jury contained eleven enumerated rights, privileges, and duties of a parent. The charge then provided, "If no termination of the parent-child relationship is ordered, the court may modify these rights and duties by court order." Cheryl's counsel attempted to explain or give examples of what the court might do if no termination was ordered:
... But if there is no termination, in other words, if you have no on 1 and 2, you stop right there. Or if have you a yes on one of those and a no on Number 3, then there is no termination. Then the Court may ordermay modify the rights and duties of a parent. Now, I see some quizzical looks on your face, so let me talk about that in a minute. It's referring to those 11 rights up above on Page 2 and 3. So if there is no termination, the Court can say, "Okay. We can modify these rights of a parent"
The Department objected to counsel going outside the instructions given. Cheryl's counsel explained to the court that it "seems like it would be a normal thing for me to be able to argue some examples of what kind of modification there could be." The court sustained the Department's objection and instructed the jury to follow the instructions of the court that were in the charge.
Cheryl contends that her counsel should have been allowed to argue the court's ability to allow a monitored return of custody to Cheryl. Rule 269 provides that arguments on questions of law shall be addressed to the court. TEX.R. CIV. P. 269(d). Arguments on the facts should be addressed to the jury, and counsel is required to confine the argument strictly to the evidence and to the arguments of opposing counsel. Id. at (e). See Texas Sand Co. v. Shield, 381 S.W.2d 48, 58 (Tex.1964). The duty rests with the trial court to supervise and properly limit the scope of counsel's argument. See City of Dallas v. Andrews,' 149 Tex. 609, 236 S.W.2d 609, 611 (1951). Thus, a reviewing court will not interfere with the trial court's duty unless it is clear that the trial court abused its discretion. In re Guardianship of Dahl, 590 S.W.2d 191, 199 (Tex. App.-Amarillo 1979, writ ref'd n.r.e.).
Cheryl's counsel was about to venture outside the scope of Rule 269. There is no record made of what other arguments, if any, Cheryl wanted to make. Thus, the trial court did not abuse its discretion in limiting counsel's argument. Cheryl's third issue is overruled.

CONCLUSION
Having overruled each issue presented for review, the trial court's judgment is affirmed.
Justice VANCE, dissenting.
VANCE, Justice, dissenting.
The majority uses an erroneous standard of review for factual sufficiency of the evidence. The difference between the legal-sufficiency standard of review and the factual-sufficiency standard of review is "how the evidence is reviewed." In re J.F.C., 96 S.W.3d 256, 266 (Tex.2002). What the majority does not say, and what makes a difference in this case, is that in a factual-sufficiency review, the evidence should be viewed in a neutral light. It is true that the Supreme Court did not expressly say that in J.F.C., but it is implicit in the opinion. How else could an appellate court "consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding"? Id. How else could an appellate court determine "in *827 light of the entire record, [whether] the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" about its finding? Id.
In recognizing the duty of the courts of appeals to review the factual sufficiency of the evidence to support a guilty finding in a criminal case, where the burden of proof is "beyond a reasonable doubt," the Court of Criminal Appeals made a point of attempting to "harmonize" the standards between civil and criminal cases. Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). In Clewis and opinions following it, the Court has consistently stated that a factual-sufficiency review is conducted "without the prism of `in the light most favorable to the verdict'" as is required in a legal-sufficiency review.
In cases involving findings made by a preponderance of the evidence, the courts of appeals view the evidence in a "neutral light" when reviewing for factual sufficiency. Nelson v. Najm, 127 S.W.3d 170, 174 (Tex.App.-Houston [1st Dist.] 2003, pet. filed); Lazell v. Stone, 123 S.W.3d 6, 9 (Tex.App.-Houston [1st Dist.] 2003, pet. denied); Roundville Partners L.L.C. v. Jones, 118 S.W.3d 73, 78 (Tex.App.-Austin 2003, pet. denied); General Motors Corp. v. Iracheta, 90 S.W.3d 725, 730 (Tex.App.-San Antonio 2002, pet. denied); C & D Robotics, Inc. v. Mann, 47 S.W.3d 194, 200 (Tex.App.-Texarkana 2001, no pet.).
Without that neutrality, favorable evidence produced by an appellant-parent could never cast doubt upon a jury's verdict because it would not be considered. This is particularly inauspicious in a termination-of-parental-rights case, which is ordinarily dependent on subjective factors.
[Parental-rights termination] proceedings apply imprecise substantive standards that leave determinations unusually open to the subjective values of the [factfinder]. In appraising the nature and quality of a complex series of encounters among the agency, the parents, and the child, the [factfinder] possesses unusual discretion to underweigh probative facts that might favor the parent. Because parents subject to termination proceedings are often poor, uneducated, or members of minority groups, such proceedings are often vulnerable to judgments based on cultural or class bias.
The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense. No predetermined limits restrict the sums an agency may spend in prosecuting a given termination proceeding. The State's attorney usually will be expert on the issues contested and the procedures employed at the factfinding hearing, and enjoys full access to all public records concerning the family. The State may call on experts in family relations, psychology, and medicine to bolster its case. Furthermore, the primary witnesses at the hearing will be the agency's own professional caseworkers whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.
Santosky v. Kramer, 455 U.S. 745, 762-63, 102 S.Ct. 1388, 1399-1400, 71 L.Ed.2d 599 (1982).
My conclusion is that we should review the factual sufficiency of the evidence supporting findings made under a clear-andconvincing-evidence standard in a neutral light. The majority has failed to do so. Rather, the analysis makes no distinction between the standards and is essentially *828 the same for both. It fails to recognize that the evidence can preponderate in favor of the finding but still fail the clearand-convincing test. See In re C.H., 89 S.W.3d 17, 25 (Tex.2002) (evidence can be more than a preponderance and not clear and convincing).
But even if the majority had properly applied our factual-sufficiency standard of review, there are factors other than the Holley factors that should be considered in reviewing' a finding that termination is in the best interest of a child. Holley v. Adams, 544 S.W.2d 367, 372 (Tex.1976). Holley predates the current version of the Family Code by a number of years and was a termination action between private parties, where one parent would still enjoy the parent-child relationship. The Legislature has now adopted other factors that must be considered when TDPRS has been named temporary managing conservator of a child and the question of placement is being considered i.e., those listed in section 263.307 of the Family Code. TEX FAM.CODE ANN. § 263.307 (Vernon 2002). In termination proceedings brought by the Department, such as in this case, the Department is named temporary managing conservator by the court.
If the determination were being made as of ten months prior to trial, I would agree that the evidence is legally and factually sufficient to support the jury's findings. However, in the majority's analysis, the status at the time of trial was:
 Cheryl thought that, with time, she and C.J.B. could reestablish their bond;
 Krista Kumahata had move to Houston in July of 2001 and had not been around C.J.B.;
 Several of Cheryl's friends testified that she was good with their children;
 Cheryl was currently in AA and NA, had a sponsor, was in the fourth step of a twelve-step program;
 Cheryl participated in individual counseling; C.J.B. participated in therapy;
 Cheryl agreed that C.J.B. needed therapy and his problems needed to be addressed; she had a planned daily routine for C.J.B.;
 Cheryl had a daycare selected and had an insurance plan to include C.J.B.;
 Cheryl would work with a therapist on C.J.B.'s problems;
 After being discharged from the Freeman Center, Cheryl had been in the same apartment and had the same job;
 Cheryl's counselor at the Freeman Center gave her an excellent prognosis for maintaining her sobriety;
 Her apartment was clean and orderly, even on surprise visits;
 In ten months, no evidence suggested that Cheryl might have begun to drink again.
Where is the "clear" and "convincing" evidence of best interest? The Department's decision was "not to risk" C.J.B.'s well-being. According to the majority:
 Jeanie Cochrane, the current fosterparent, knew nothing about Cheryl, but testified to what she "thought" was inappropriate sexual behavior in a child less than three years old;
 Dr. Chieza was "concerned" about sexual abuse or "exposure to things like that" in the past;
 Dr. Chieza compared C.J.B.'s behavior to those associated with fetal-alcohol syndrome;
 Dr. Chieza was "concerned" that C.J.B.'s problems would be reinforced;
 Dr. Chieza recommended "play therapy";
 Dr. Grossman "believed" that C.J.B. was re-enacting sexual behavior he witnessed or experienced;

*829  Dr. Grossman said children who have suffered neglect "can have these behaviors";
 Belinda Honey "believed" it would be detrimental to place C.J.B. back with Cheryl;
 Jesse Guardiola "became concerned" after reading a report about the second removal some ten months earlier; he "felt" Cheryl might contact her former husband again; he no longer trusted Cheryl;
 Dr. Chieza was "concerned" that a relapse by Cheryl would reinforce C.J.B.'s problems.
Dr. Chieza saw C.J.B. once, and Dr. Grossman spoke only about C.J.B. and said nothing about Cheryl.
I believe that a neutral review of all of the evidence shows that, as of the time of trial, no reasonable factfinder could conclude by clear-and-convincing evidence that termination of Cheryl's parental rights was in C.J.B.'s best interest. The jury's determination could have been made only on speculation and conjecture and by giving undue weight to historical events that suggested a status for Cheryl that was not true at the time of trial.
Under the Family Code, the public policy of this state is to:
(1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child;
(2) provide a safe, stable, and nonviolent environment for the child; and
(3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.
TEX. FAM.CODE ANN. § 153.001 (Vernon 2002).
As we said in In re A.M.C., "termination is a drastic remedy." In re A.M.C., 2 S.W.3d 707, 710 (Tex.App.-Waco 1999, no pet.). Because of the constitutional dimension of the right, the final and irrevocable nature of a termination decree, and the enunciated public policy of this State in assuring that a child will have frequent and continuing contact with its parents who have shown the ability to act in the best interest of the child, I would hold the evidence to be factually insufficient to support the "best interest" finding and reverse the judgment and remand the cause to the trial court for further proceedings.
NOTES
[*] This case was submitted with former Chief Justice Davis on the panel, but he resigned effective August 4, 2003. See TEX.R.APP.P. 41.1(c). Justice Reyna, who took the oath of office on January 5, 2004, participated in the decision of the court.
[1] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549 (Tex. 1995).
[2] For a discussion of play therapy, see Campos v. State, 977 S.W.2d 458, 463-464 (Tex. App.-Waco 1998, no pet.).
[3] We note that most of the evidence referenced by the dissent does not dispute evidence which supports the best interest finding. Rather, it is simply evidence which does not support the finding of best interest. We have considered all the evidence, including this evidence that does not support the best interest finding in our evaluation of the legal and factual sufficiency of the evidence.