COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-329-CV

IN THE INTEREST OF E.L.R., 

J.A.N., AND A.M.P., CHILDREN 

------------

FROM THE 393RD DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I. Introduction

Appellant Briget R. appeals the trial court’s order terminating her parental rights to her three children, E.L.R., J.A.N., and A.M.P.   In four points, Briget argues that the evidence is legally and factually insufficient to support the trial court’s order of termination based on its findings that she knowingly allowed the children to remain in endangering surroundings and engaged in endangering conduct.  We affirm.

II. Factual and Procedural Background

Briget is married to Jose Luis R.  On June 5, 1994, she gave birth to her oldest son, E.L.R.  Although she thought that Jose Luis was E.L.R.’s father, a paternity test later revealed that E.L.R.’s father was Abel N., a man with whom Briget had a brief relationship.  Later in 1994, Briget began a relationship with Juan N., with whom she had J.A.N., her second son, on January 25, 1996.  

In July 1998 Briget was first referred to Child Protective Services (CPS)
 
due to an allegation that she threatened to drive her car with her children in it into an 18-wheeler.  Guardianship proceedings were initiated by her mother and stepfather, and E.L.R. and J.A.N. were subsequently sent to live with Briget’s mother. 

In the summer of 1999, Briget regained custody of her children, but she was referred to CPS again later that year because of an allegation that she hit E.L.R.  Between August 2000 and June 2001, Briget was referred to CPS two more times due to allegations that she had physically abused J.A.N.

Sometime in 2001, Briget began a relationship with Norberto Malagon P. On January 11, 2002, they had a daughter, A.M.P., Briget’s third child.

In early March 2004, in response to a report from J.A.N.’s school that J.A.N. was expressing suicidal thoughts because of problems at home, CPS sent an investigator, Michelle Hiza, to interview J.A.N. and E.L.R., and to investigate Briget’s residence.  On March 25, 2004, Hiza spoke with Briget, and Briget explained that she had problems and felt overwhelmed; that she did not know what to do with her children or how to help them; that her children were difficult to take care of; that she had been off of her medications for a while; and that she was depressed and had thoughts of suicide.  That same day, Briget wrote a statement expressing similar feelings.  

On March 29, 2004, the trial court allowed the Texas Department of Family and Protective Services (the Department) to remove E.L.R., J.A.N., and  A.M.P. from Briget’s home and set a hearing regarding conservatorship and termination of the parent-child relationship.  After a four-day trial, the trial court found

by clear and convincing evidence that termination of the parent-child relationships between [Briget] and [the children is] in the children’s best interest.

[The court also found] by clear and convincing evidence that [Briget] has 

knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;

engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children.
(footnote: 2)  

The trial court appointed the Department as managing conservator for E.L.R. and A.M.P., and appointed Juan Bustamante N., J.A.N.’s father, as his managing conservator.  The trial court rendered judgment terminating Briget’s parental rights to the children and this appeal followed.  

III. Standards of Review

A parent’s rights to “the companionship, care, custody, and management” of his or her children are constitutional interests “far more precious than any property right.”
(footnote: 3) 
 “While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.”
(footnote: 4) 
 In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child’s right to inherit.
(footnote: 5) 
 We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.
(footnote: 6)
 In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.
(footnote: 7)  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.
(footnote: 8) 

 
 Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.
(footnote: 9)  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.
(footnote: 10) 
  It is defined as the “measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.”
(footnote: 11) 

The higher burden of proof in termination cases elevates the appellate standard of legal sufficiency review.
(footnote: 12)  The traditional no-evidence standard does not adequately protect the parent’s
 constitutional interests.
(footnote: 13)  In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven.
(footnote: 14)  We must review all the evidence in the light most favorable to the finding and judgment.
(footnote: 15)  This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so.
(footnote: 16)  We must also disregard all evidence that a reasonable factfinder could have disbelieved.
(footnote: 17)  We must consider, however, undisputed evidence even if it is contrary to the finding.
(footnote: 18)  That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not.
(footnote: 19) 

This higher burden of proof 
also elevates the appellate standard of factual sufficiency review.
(footnote: 20)  “[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance.”
(footnote: 21)  In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven.
(footnote: 22)  Our inquiry here is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated
 section 161.001(1)(D) or (E).
(footnote: 23)  

The distinction between legal and factual sufficiency lies in how we review the evidence.
(footnote: 24) 
 In a factual sufficiency review, in determining whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true, we must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding.
(footnote: 25)  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.
(footnote: 26)
IV. Endangering Conduct

We first review Briget’s third and fourth points, in which she complains that the evidence is both legally and factually insufficient to support the trial court’s finding that she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children under section 161.001(1)(E) of the family code.
(footnote: 27) 
 

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child’s physical well-being was the direct result of the parent’s conduct, including acts, omissions, or failures to act.
(footnote: 28) Endangerment under this section must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.
(footnote: 29)  It is not necessary, however, that the parent’s conduct be directed at the child or that the child actually suffer injury.
(footnote: 30)  

To determine whether termination is necessary, courts look to parental conduct both before and after the child’s birth.
(footnote: 31)  A parent’s past endangering conduct may create an inference that the parent’s past conduct may recur and further jeopardize a child’s present or future physical or emotional well-being.
(footnote: 32)
 Mental illness of a parent alone is not grounds for terminating the parent-child relationship; however, if a parent’s mental state causes her to engage in conduct that endangers the physical or emotional well-being of a child, that conduct can be considered in a termination proceeding.
(footnote: 33)  This conduct includes a parent’s attempts to commit suicide.
(footnote: 34)  In addition, conduct that subjects a child to a life of uncertainty and instability also endangers the child’s physical and emotional well-being.
(footnote: 35)
 The record contains the following evidence of Briget’s endangering conduct:

A.  Briget’s Mental Health 

The record shows that Briget has an extensive history of psychological problems, which she has been unable to effectively treat.  Briget was raised in a violent and unstable family; she was first hospitalized at the age of twelve for attempting suicide, hospitalized again when she was fifteen years old, and, in total, has spent about five years in and out of psychiatric institutions.  She was diagnosed as Bipolar II and has spent most of her life on and off medications to treat that disease. 

At trial, Briget admitted that she was not stable at the time when guardianship proceedings were initiated by her mother and stepfather in 1998. On March 25, 2004, after CPS conducted a home investigation, Briget submitted the following written statement:  “I am emotionally unstable at this time to take care of my kids.  I’m very confused.  I just started 2 [weeks] ago on my medications for bipolar.”  Briget also told the CPS investigator that she was depressed and had thoughts of suicide.  Briget mentioned suicide again at a later date when she was speaking to a CPS case worker in the CPS parking lot.  

In May 2004, after her children were removed, Briget was evaluated by a psychologist, Dr. Mark Foster.  Dr. Foster noted that Briget’s thinking was cloudy, her reasoning was not sound, and she had difficulty staying on tasks.  These facts indicated to him that she was either not taking her medications or not responding well to them.  Based on his examination, he provided the following psychological snapshot of Briget to the trial court:

This seems to be an individual that has some problems thinking clearly.  This is an individual that is going to have . . . a history of unstable relationships, difficulty managing their emotions, particularly feelings such as anger[,]. . . . poor impulse control[,]  . . . difficulty learning from past mistakes; that is, I would expect that she will have to repeat the same mistakes many, many times  before she learns from her mistake.  That there is a very strong inclination towards, if something bad happens, to push it out of consciousness . . . quickly and try to get life back to normal as fast as possible.

This is not somebody that’s going to cope with just day-to-day daily stress very well; . . . the challenges of living in our modern world are going to present more difficulties in terms of coping than for most people, considerably more.

Because there is a strong orientation to avoid looking at problems . . . with self-examination, these are persons that typically don’t benefit a great deal in counseling or psychotherapy. 

B.  Educational and Special Needs of the Children 

The record shows that Briget was unable to care for the children’s educational and special needs.  Both E.L.R. and J.A.N. were diagnosed with language delay, and had developmental and behavioral problems. 

Specifically, in 1997 when E.L.R. was three years old, Johnnie Pettigrew, a diagnostician with Denton ISD, diagnosed him with language delay, a speech impairment, and global developmental delay.  Pettigrew noted that one of the strongest causes of global development delay was the lack of interaction between a child and a parent and that Briget’s depression might have caused her to withdraw from E.L.R.  By the age of four, E.L.R. was still not potty-trained and drank from a bottle.  E.L.R. was subsequently diagnosed with ADHD.

In 1999, Pettigrew also diagnosed J.A.N. when he was three years old.  Although J.A.N. had some language delay, articulation errors, and behavioral problems, his problems were not as severe as E.L.R.’s. 

In 2000, when J.A.N. was four years old, Martha Mendoza was assigned to be his home intervention instructor through a Home Instruction for Parents with Preschool Youngsters program.  Mendoza’s job was to go to J.A.N.’s home once each week to teach Briget how to work effectively with J.A.N. Mendoza did not have success with Briget, however, because Briget kept cancelling appointments and refused to participate in the weekly activity assignments for J.A.N.’s benefit.  As a result, Mendoza obtained permission to work one-on-one with J.A.N., and do the weekly activities with him herself.   During the next two years that Mendoza worked with J.A.N. at home, she noticed that Briget did not discipline any of her children, that they did not listen to her, that she could not control E.L.R., and that the children “did whatever they want[ed].”  Mendoza also noticed that the family was not clean, the home was always messy, and that the home smelled of Briget’s cigarette smoke to the extent that the smell got on Mendoza’s clothes.  Although J.A.N. eventually began to obey Mendoza and progress, he would not listen to Briget.   In October 2000, Rhonda Boaz, a case management counselor with Mental Health Mental Retardation (MHMR), began working with E.L.R.  During the seven months she worked with E.L.R., Boaz found Briget to be resistant to out-of-home placement for E.L.R. and inconsistent in bringing him to MHMR for treatment.  

While E.L.R. attended Riviera Elementary School in 2002, Pettigrew observed inappropriate exchanges, or fighting, between E.L.R. and his mother in the hallway.  On one occasion, E.L.R.’s resource room teacher had to physically restrain him because he put himself and another child in danger.  

In the fall of 2003, two or three weeks into the school year, Briget enrolled E.L.R. and J.A.N. in Newton Rayzor Elementary School.  After a few weeks at the new school, E.L.R. began to have angry outbursts in the classroom and became violent, noncompliant, and out of control.  He hit the other children without provocation, and on one occasion, he threw a chair.  A behavioral intervention plan was implemented for E.L.R. but was discontinued two and a half weeks later after E.L.R. attacked one of the instructional aides.  On October 1, 2003, E.L.R was sent to a school called Evers Park, which had teachers that are specially trained to work with children with special needs. 

During that same time in 2003, Briget would frequently bring A.M.P. to Newton Rayzor with her when she had to visit the school.  Although A.M.P. was one and a half years old, she never spoke; she was always dressed in only a diaper, was dirty, and had a runny nose.  One of the staff members at Riviera Elementary noted that when Briget would bring A.M.P. to school with her, A.M.P. always sat on the floor beside her mother or on her mother’s lap and had no interaction with anyone, and that her behavior did not seem age-appropriate.  

E.L.R.’s attendance at Evers Park was interrupted on January 15, 2004, when he was sent to Millwood Psychiatric Hospital after exhibiting explosive behavior at home.  At that time, E.L.R. was diagnosed with major depressive disorder, intermittent explosive disorder, ADHD, a possible bipolar condition, and prescribed new medications.  

After E.L.R. returned to Evers Park, he often came to school dirty and very tired and fatigued.  He exhibited extreme mood swings, such that the school nurse suspected that Briget was not administering E.L.R.’s medicine properly.  The nurse explained these problems to Briget, but Briget failed to correct them.  And although the nurse offered to give E.L.R.’s medications to him at school, Briget refused.  

On one occasion in February 2004, the staff at Evers Park had difficulty awakening E.L.R., so they took him into the nurse’s office to let him sleep for a few hours.  After he woke up, E.L.R. called Briget from the school, but she said she could not pick him up because she did not have a working car.  E.L.R. then became agitated and had to be restrained.  The school contacted Briget multiple times during the day, but she stated that she was unable to retrieve E.L.R.  E.L.R. continued to be aggressive and combative, ultimately throwing a glass bowl across the conference room.

On March 3, 2004, E.L.R. exhibited violent behavior on the school bus.  He was removed from the bus by two social adjustment class aides, restrained, and put into a time-out room.  Because Briget still did not have a car, a police officer picked her up from her house and brought her to the school to discuss the incident.  Briget indicated to the Evers Park nurse that she often relied on the police for transportation and to discipline her children.

During the same 2003-2004 school year, J.A.N. was in the second grade.  By the end of the school year, however, there was some question as to whether he would move on to the third grade because he had been absent from school forty-eight days and tardy ninety-two days that year.  In fact, Briget was subsequently convicted for the absences by a truancy court.  

On March 12, 2004, J.A.N. came to school with his mother and he was very upset.  J.A.N. told the school staff that the night before, E.L.R. had thrown him against a television and had hit Briget.  J.A.N. said that he wanted to kill himself because he was tired of “this whole thing” and that his mother did not do anything about it.   

C.  Negligent Supervision

The record contains evidence showing that Briget was unable to properly supervise her children.  In 2001, Briget made numerous calls to the police regarding her children; she made two reports that E.L.R. assaulted her, six reports that he had run away, one report that another child had assaulted him, and one report that he was defiant and uncontrollable. 

On September 1, 2002, when he was eight years old, E.L.R. was hit by a car in his apartment complex’s parking lot.  On November 22 of the same year, J.A.N. was hit by a car.  As a result, J.A.N. was in a full body cast, temporarily unable to walk, and bedridden for a month and a half. Approximately four months after J.A.N.’s accident, his cousin almost hit him with her car when he crossed a street without looking.  

Another time after J.A.N.’s accident, Briget called J.A.N.’s cousin at midnight and told her that J.A.N. had run away.  J.A.N.’s cousin and aunt got up and started to search for J.A.N. in the neighborhood.  Briget then called them back to say that he had returned home.  J.A.N.’s cousin then went over to Briget’s house and saw J.A.N. sitting on the sofa, crying and yelling that he wanted his father. 

Some time later, J.A.N.’s cousin received another call from Briget that J.A.N. had run away from the Dollar Store and she was afraid he would get hit by a car again.  When his cousin went to the Dollar Store to help Briget, however, she did not find Briget or any of the children there. 

D. CPS’s Investigation and Removal of the Children

On March 22, 2004, after J.A.N. had told the school staff about his suicidal thoughts, Hiza, a CPS investigator, went to J.A.N.’s school to investigate the situation.  She interviewed J.A.N. and he told her that he wanted to kill himself because E.L.R. was mean to him, that he frequently thought about suicide, that E.L.R. hit him frequently, that E.L.R. had thrown him into a television, and that his mother was aware of E.L.R.’s behavior towards him.

Hiza also interviewed E.L.R. at his school the same day.  E.L.R. did not admit that he hit J.A.N., but he did say that J.A.N. agitated him.  E.L.R. said that he watched his little sister, A.M.P., and that he disciplined her by spanking her, as he had seen his mother do.  He also told Hiza that his aunt had punched him in the face and kicked him in the stomach. 

Hiza then went to Briget’s residence, and at the time all three children were there.  All of the children were dirty, and their clothes were filthy.  A.M.P. had a thick layer of dirt on her and her hair was greasy. 

Although Hiza was at the residence for almost two hours, she never heard A.M.P. speak.  A.M.P. threw continual fits, however; throughout the entire visit, A.M.P. pinched her mother, threw herself on the ground, kicking and screaming, and repeatedly hit the family cat in a mean way.  According to Hiza, Briget did not have control over the situation. 

E.L.R. and J.A.N. were outside playing for most of Hiza’s visit.  Briget never went outside to check on them while Hiza was there.  Just before Hiza left, E.L.R. and J.A.N. came inside the apartment fighting, both complaining that the other had hit him, and after J.A.N. told his mother what had happened, he punched the family cat.  

On March 29, 2004, the Department removed the children from Briget’s home.  At trial, Briget admitted that she did not feel like she was a fit parent at that time.

E.  Events After Removal

After the children were removed, Briget was allowed to visit with J.A.N. and A.M.P. on a weekly basis.  Out of forty-four possible visits, Briget either cancelled or failed to appear sixteen times.  On the first visit Briget had with the children, A.M.P. did not acknowledge Briget, and then A.M.P. started screaming, and continued to scream or cry for most of the visit.  The foster care agency was concerned about A.M.P.’s reactions to the visits with her mother and noticed that A.M.P. had more temper tantrums and problems after the visits.   

A typical visit for Briget, J.A.N., and A.M.P. involved setting out and eating food that Briget had brought.  Briget would tell J.A.N. to sit down and eat, but he would not listen to her.  Although Briget would tell J.A.N. not to listen to his music until after he had eaten, he would disobey her request and she would not reprimand him.  Often no one in the room would interact with one another.  In addition, it was not unusual for Briget to “zone out” or stare off into space for ten minutes at a time.  

In May 2004, Briget told J.A.N. at one of their visits that she had gotten him a puppy.  Over the next couple of months, they talked about the dog during their visits; they even named the dog.  J.A.N. wanted Briget to let the dog come live with him and his father, with whom he was living at the time, but Briget refused.  In December 2004, J.A.N. asked about the dog and Briget told him that it had gotten too big and she had sent it to the pound.  

After E.L.R. was removed from Briget’s home, he was taken to a residential treatment center in Lubbock, Texas.  Although E.L.R. still had behavioral problems at the time of trial that would make it difficult for any person to parent him, he was beginning to show signs of improvement and gain some pride in himself.   

After J.A.N.’s removal, he went to live with his father, Juan N.  Although J.A.N. would not initially obey his father, by the time of trial, he was following his father’s rules.  Numerous witnesses identified that J.A.N.’s behavior greatly improved after he began living with his father, he seemed much happier, had a better attitude, and was much cleaner; his peers no longer avoided him because of his smell, and his self-esteem was better as a result.  He was punctual and had better attendance at school; his grades were improving and he appeared cared-for. 

After A.M.P. was removed from Briget’s residence, she was placed in a foster home.  Jennifer Gradante, the treatment director for the foster agency, first saw A.M.P. within a few days of her placement.  At the time, A.M.P. had just turned two years old.  Gradante described A.M.P. as unable to react to noises or her environment,  that she appeared “catatonic,” and that she was well outside the normal limits; Gradante could move A.M.P. into different positions and A.M.P. would stay in them.  Gradante opined that multiple things, such as various forms of abuse and neglect, could have caused A.M.P.’s reactions.  By the time of trial, however, A.M.P. had progressed in terms of age-appropriate developmental tasks but was still very delayed with her adaptive skills for her environment.  The CASA volunteer who visited with A.M.P. noted that A.M.P. had bonded with two of the other foster girls, that she followed them around, and that she laughed and smiled. 

In August 2004, approximately four months after the children’s removal, a CASA volunteer and the children’s attorney ad litem made an unannounced visit to Briget’s home.  The house was dirty, filled with bugs, and trash was everywhere.  The dog Briget had promised J.A.N. was locked in the boys’ room, and there was dog urine and feces all over the floor in that room as well as other areas of the home.  

Applying the appropriate standards of review to the evidence in this case, we hold that the evidence that Briget was unable to effectively manage her own mental health problems, that she was unable to meet the educational needs of her children or tend to their special needs, that she negligently supervised her children, and that she failed to maintain a clean living environment for her children both before and after their removal is both legally and factually sufficient to show that Briget engaged in a voluntary, deliberate, and conscious course of conduct that endangered the physical and emotional well-being of her children.  Therefore, the evidence is legally and factually sufficient to support the trial court’s finding of endangerment under section 161.001(1)(E), and 
we overrule Briget’s third and fourth points.
(footnote: 36)
V. Conclusion

Having overruled each of Briget’s dispositive points on appeal, we affirm the trial court’s judgment.  
 

PER CURIAM

PANEL F:  CAYCE, C.J.; DAUPHINOT and HOLMAN, JJ.

DELIVERED:  April 5, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
The trial court also terminated Jose Luis’s parental rights to the children, Abel N.’s parental rights to E.L.R., and Norberto Malagon P.’s parental rights to A.M.P. for other reasons.  None of these parties, however, appealed the order of termination.

3:
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); 
In re M.S.
, 115 S.W.3d 534, 547 (Tex. 2003). 

4:
In re C.H.
, 89 S.W.3d 17, 26 (Tex. 2002).

5:
T
EX
. F
AM
. C
ODE
 A
NN
. § 161.206(b) (Vernon Supp. 2007); 
Holick v. Smith
, 685 S.W.2d 18, 20 (Tex. 1985).  

6:
Holick
, 685 S.W.2d at 20-21;
 In re E.S.S.
, 131 S.W.3d 632, 636 (Tex. App.—Fort Worth 2004, no pet.).

7:
T
EX.
 F
AM.
 C
ODE
 A
NN.
 § 161.001 (Vernon Supp. 2007); 
In re J.L.
, 163 S.W.3d 79, 84 (Tex. 2005). 

8:
Tex. Dep’t of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).

9:
T
EX
. F
AM
. C
ODE
 A
NN
. §§ 161.001, 161.206(a); 
In re J.F.C.
, 96 S.W.3d 256, 263 (Tex. 2002).  

10:
In re G.M.
, 596 S.W.2d 846, 847 (Tex. 1980); 
In re K.W.
, 138 S.W.3d 420, 425 (Tex. App.—Fort Worth 2004, pet. denied).

11:
Tex. Fam. Code Ann.
 § 101.007 (Vernon 2002).

12: 
In re J.F.C.
, 96 S.W.3d at 265.

13:
Id.

14:
Id
. at 265-66.

15:
Id.
 at 266.

16:
Id.

17:
Id.

18:
Id.

19:
City of Keller v. Wilson
, 168 S.W.3d 802, 827 (Tex. 2005).

20:
In re C.H.
, 89 S.W.3d at 25.

21:
Id.

22:
Id
. 

23:
Id
. at 28. 

24:
J.F.C.
, 96 S.W.3d at 266.

25:
Id.

26:
Id.

27:
See 
T
EX
. F
AM
. C
ODE
 A
NN
. § 161.001(1)(E).

28:
In re R.D.
, 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied); 
Dupree v. Tex. Dep't of Prot. & Regulatory Servs.
, 907 S.W.2d 81, 83-84 (Tex. App.—Dallas 1995, no writ). 

29:
T
EX
. F
AM
. C
ODE
 A
NN
. § 161.001(1)(E); 
In re D.T.
, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2001, pet. ref’d);
 In re K.M.M.
, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.).

30:
Boyd
, 727 S.W.2d at 533.   

31:
In re D.M.
, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

32:
See id.
 at 813.

33:
See In re C.M.B.
, 204 S.W.3d 886, 895 (Tex. App.—Dallas 2006, pet. filed); 
Carter v. Dallas County Child Welfare Unit
, 532 S.W.2d 140, 141-42 (Tex. Civ. App.—Dallas 1975, no writ); 
see also 
In re C.D.
, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) (
a parent’s mental condition and suicide attempts are factors to consider in determining whether the parent engaged in endangering conduct
)
. 

34:
See In re A.M.C.
, 2 S.W.3d 707, 716 (Tex. App.—Waco 1999, no pet.) (finding endangerment from mother’s suicidal thoughts, suicide attempts, and neglect).

35:
See In re S.D., 
980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

36:
When multiple grounds for termination are alleged, only one predicate finding under section 161.001(1) is necessary to support a judgment of termination.
  
In re A.V.
, 113 S.W.3d 355, 362 (Tex. 2003).  
Because we hold that Briget engaged in conduct that endangered the physical or emotional well-being of her children under section 161.001(1)(E), we need not address the remaining statutory ground for termination that was found by the trial court.