COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT WORTH

 

 

                                        NO.
2-07-026-CV

 

 

IN THE INTEREST OF                                                                            

J.P., MINOR CHILD                                                                              

 

                                              ------------

 

          FROM
COUNTY COURT AT LAW NO. 2 OF WICHITA COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

We withdraw the prior
memorandum opinion and dissenting opinion of January 31, 2008 and substitute
the following in their place to make nonsubstantive, clerical changes only. 

Introduction








Appellant Laura N. appeals
the trial court=s order
terminating the parental rights to her child, J.P.  In two issues, appellant argues that the
evidence is legally and factually insufficient to support the trial court=s endangerment  and best
interest findings.  We reverse and
remand. 

Background Facts

On July 7, 2005, appellant
gave birth to her son, J.P.  While in the
hospital, appellant exhibited what the hospital staff thought was alarming
behavior, such as leaving J.P. alone in the room, pacing the halls, and failing
to remember parenting instructions.  The
hospital contacted Texas Department of Family and Protective Services (TDFPS),
and TDFPS investigator Christina Burt visited appellant at the hospital on July
10, 2005.  Burt testified at trial that
appellant was coherent when she spoke with her at the hospital.  Appellant told Burt her mental history, which
included schizoaffective, bipolar, and obsessive compulsive disorders.  Appellant testified that her memory following
J.P.=s birth is Afuzzy@ because of an adverse reaction to her epidural and postpartum
depression. 

After meeting with appellant,
Burt visited appellant=s home on Carolina Street
while she and J.P were still in the hospital. 
During the trial, Burt testified that when she had arrived at appellant=s house,








[t]he odor in the home was nauseating. 
There was a very strong odor of what I believe was cat urine and cat
feces and it was nauseating.  There were
piles of clothing and clutter throughout the house.  There was what I believed was animal feces
smeared on the floors, and there didn=t appear to be any area for
the baby to be.  There wasn=t a
room set up, there wasn=t a
bed set up. . . .I did not see a car seat. . . . I did not see a
playpen. . . . I did not see a crib. . . . I saw parts of a
bassinet. 

 

Burt determined that the
home was not a suitable environment for a child.  Burt also testified that she visited
appellant=s mother=s trailer on Blairhouse
 Road
, and although the home was crowded because
appellant=s sister and
her child were also living there, it was adequate.  Burt discussed her concerns with appellant
and appellant agreed on a safety plan, which included appellant=s staying with her mother and cooperating with TDFPS.  

Appellant
and J.P. stayed with appellant=s mother as requested by TDFPS until July 20, 2005, when appellant
returned to her apartment due to tensions with her sister.  The next day, on July 21, 2005, Susan Hawes,
appellant=s sister,
contacted Burt and told her that appellant had left their mother=s house.  Burt, however, did
not know until trial that appellant had stayed at her apartment on Carolina Street in
violation of the safety plan. 








Also on July 21, 2005, North
Texas Community Care Center (NTCCC) also contacted Burt because appellant had
brought J.P. in for a check-up and was acting Abizarre.@  Burt went to NTCCC and found appellant
agitated.  At appellant=s request, Burt took her and J.P. to the Crisis Respite Center (CRC),
an emergency care center for mental health issues.  Burt testified that appellant was more
familiar with CRC, and appellant told Burt that J.P. could not accompany her to
CRC if they kept her.  Burt took J.P. at
that time because appellant could not take a child with her to CRC.[2]  Appellant testified that she was at CRC for
fifteen minutes.  CRC checked her
medications and told appellant that she had postpartum depression.  J.P. has remained in foster care since July
21, 2005 and is now about two and a half years old.

Later that day, Burt returned
to appellant=s
apartment.  Burt testified at the hearing
that the apartment was in a better condition than it had been when she had seen
it two weeks before, but she found that there was still a cat odor, clutter,
and a lack of appropriate child equipment. 
Burt testified that appellant=s mental state on July 21, 2005, and the condition of the home, caused
her to pursue removal of the child.  On
July 22, 2005, the trial court granted the TDFPS emergency custody of J.P. 








Following removal, TDFPS gave
appellant a service plan, which required appellant to participate in family
group conferences, complete parenting classes, attend counseling, and
demonstrate age-appropriate parenting skills. 
The caseworker for TDFPS, Linda Johnson, testified that, at the time of
trial, appellant had not been able to demonstrate age-appropriate parenting
skills during visitations and stated that on one occasion, appellant had
slapped  J.P.=s hand.  Johnson tried to give
appellant child development information and asked her not to hit the baby=s hand, but appellant became defensive, angry, and hostile.  In addition, Johnson testified that appellant
could not appropriately feed J.P. 
Carissa Matlock, a case supervisor for Child Advocates, the local CASA
branch, also testified regarding appellant=s parenting skills and ability to properly feed J.P.  Matlock stated that during one visitation,
appellant was changing J.P.=s diaper when he began urinating. 
Appellant just laughed instead of covering it up or trying to clean up
the mess.  Matlock testified that many
times appellant seemed anxious, and she paced while carrying J.P.  Matlock feared appellant would drop him.  Matlock also testified about an incident that
occurred when appellant was trying to feed J.P. 
Appellant became agitated and threw the jar of baby food in the trash
can, but Matlock later saw appellant feeding J.P. again and believed appellant
retrieved the jar out of the trash can. Matlock testified that appellant did not
demonstrate adequate parenting skills.








Another aspect of appellant=s service plan required her to choose friends and associates carefully
and provide information to her caseworker regarding people staying in her
home.  Johnson testified that appellant
had not complied with this part of her service plan.  Appellant testified that she had not made
wise choices in boyfriends, friends, and associates, but she did not explain
why she failed to provide information about her associates to TDFPS.  Appellant engaged in several brief
relationships with men she had met over the Internet, many of whom had mental
health problems, proposed to her, or had criminal offenses. 

Appellant also underwent a
psychological evaluation and counseling. Appellant saw Dr. Butler, a counselor
and therapist, from September to December 2005, until the sessions ended by
mutual agreement because Dr. Butler did not think he could help appellant
anymore.  Appellant then saw therapist
Dr. Vandehey during February and March 2006, but when his Medicare number
expired, he could no longer see appellant. 
Around May 21, 2006, during the period between seeing Dr. Vandehey and
finding a new doctor, appellant called the CRC to get counseling.  Appellant testified that she was trying to
get help and made a flippant remark stating, AWhat do I have to do to get help around here, slit my wrists?@  Appellant=s comment resulted in her being committed for twenty-nine days in a
state hospital.  Appellant later told
Johnson that she had a nervous breakdown. 








Appellant testified that she
had been hospitalized seven to eight times since learning of her mental
difficulties at age twenty.  She also
testified that she has threatened suicide Amany times.@  Appellant also stated that she had been in
and out of the CRC Anot more
than two dozen@ times
between 1997 and 2004.  Johnson, however,
admitted that appellant had sought help from mental health professionals and
complied with her counseling requirements. 
Furthermore, appellant complied with random drug screens, and Johnson
testified that she did not believe appellant was doing drugs.








Johnson also testified that
another portion of the service plan required appellant to allow Johnson to come
in and inspect her home.  The service
plan instructed appellant to maintain a safe, clean, and sanitary
environment.  On July 28, 2005, Johnson
visited appellant=s apartment
on Carolina Street
for the first time and testified that it smelled of cat urine and that there
was clutter everywhere.  The condition of
the home did not meet the appropriate standard under the service plan.  Johnson visited the home again on September
16 and October 4, 2005, and found it in a similar condition.  At some point, appellant moved back in with
her mother on Blairhouse Road
.  Johnson visited appellant at the Blairhouse Road
residence and stated that between August and December 2006, appellant=s mother=s home was a
clean, safe, and sanitary environment. 
Appellant had installed childproof mechanisms in her mother=s home and made repairs to the house. 
Appellant also had a crib, clothes, and toys.  Johnson, however, testified that it was too
soon to know if appellant could maintain the clean environment.  Johnson also testified that appellant had
poor hygiene.  For example, her feet were
sometimes black, and she had an odor. 

TDFPS also required appellant
to demonstrate her ability to save and maintain a budget as part of her service
plan.  Johnson testified about her
concern regarding appellant=s financial condition.  For
example, appellant had trouble paying her rent and being overdrawn on her bank
account.  At the time of the hearing,
however, appellant worked at Wal-Mart as a cashier, on disability, and received
Social Security.  Appellant had also
purchased a car two weeks before the termination hearing.  Appellant stated that she planned to continue
to work, wanted to raise J.P. in church, and would live with her mother.  

Johnson testified that
appellant had regularly visited and maintained contact with J.P. since he was
removed in July 2005.  She stated that
J.P. had a bond with appellant, but that appellant still lacked appropriate parenting
skills.  Johnson testified that TDFPS was
concerned that although appellant had made some improvements, the improvements
were not enough to establish a pattern that would insure J.P.=s well-being.  However, the
judge=s October 26, 2006, status hearing order stated that appellant had Ademonstrated adequate and appropriate compliance with the service
plan.@ 








          By
November 7, 2006, TDFPS sought to terminate appellant=s parental
rights.  A bench trial was held on
January 9 through January 11, 2007, when J.P. was one and a half years
old.  J.P.=s attorney ad
litem, in his closing statement, remarked that he could not give a
recommendation in the case but asked the court to take note of Matlock=s recommendation
as the guardian ad litem.  Matlock
recommended that appellant=s parental rights
be terminated.  After the termination
hearing, the trial court terminated appellant=s parental rights
to one and a half year old J.P. and determined that appellant knowingly placed
or knowingly allowed J.P. to remain in conditions which endangered his physical
and emotional well-being, engaged in conduct or knowingly
placed J.P. with persons who engaged in conduct which endangered J.P.=s physical or emotional well-being, and termination was in J.P.=s best interest.[3]  The trial court also appointed TDFPS as J.P.=s permanent
managing conservator.  Appellant filed
this appeal challenging the legal and factual sufficiency of the evidence
concerning the trial court=s endangerment and
best interest findings. 

Standard of Review








A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758-59, 102 S. Ct.
1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003). In a termination case, the State
seeks not just to limit parental rights but to end them permanentlyCto divest the parent and child of all legal rights, privileges,
duties, and powers normally existing between them, except for the child=s right to inherit.  TEX. FAM. CODE ANN. ' 161.206(b) (Vernon Supp. 2007); Holick
v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20-21; In re E.M.N., 221 S.W.3d 815, 820 (Tex. App.CFort Worth 2007, no pet.).

In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish one ground listed under subdivision (1) of
the statute and must also prove that termination is in the best interest of the
child.  TEX. FAM. CODE ANN. ' 161.001 (Vernon Supp. 2007); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex. Dep=t of Human Servs. v. Boyd, 727 S.W.2d
531, 533 (Tex.
1987).








Termination of parental
rights is a drastic remedy and is of such weight and gravity that due process
requires the petitioner to justify termination by clear and convincing evidence
instead of merely a preponderance of the evidence.  TEX. FAM. CODE ANN. '' 161.001,
161.206(a); In re J.F.C., 96 S.W.3d 256, 263-64 (Tex. 2002). 
This intermediate standard falls between the preponderance standard of
ordinary civil proceedings and the reasonable doubt standard of criminal
proceedings.  In re G.M., 596
S.W.2d 846, 847 (Tex.
1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.CFort Worth 2006, pet. denied). 
It is defined as the Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@  Tex.
Fam. Code Ann. ' 101.007
(Vernon 2002).

1.     Legal sufficiency

 








The higher burden of proof in
termination cases alters the appellate standard of legal sufficiency
review.  J.F.C., 96 S.W.3d at
265-66; In re S.B., 207 S.W.3d 877, 884 (Tex. App.CFort Worth 2006, no pet.).  The
traditional no-evidence standard does not adequately protect the parent=s constitutional rights.  J.F.C.,
96 S.W.3d at 265; S.B., 207 S.W.3d at 884.  Therefore, we must determine whether the
evidence is such that a fact-finder could reasonably form a firm belief or
conviction that the grounds for termination were proven.  In re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We must review all the evidence in the light
most favorable to the finding and judgment. 
Id.  This means that we must assume that the
fact-finder resolved any disputed facts in favor of its finding if a reasonable
fact-finder could have done so.  Id.  We must also disregard all evidence that a
reasonable fact-finder could have disbelieved. 
Id.  We must consider, however, undisputed
evidence even if it is contrary to the finding. 
Id.  That is, we must consider evidence favorable
to termination if a reasonable fact-finder could and disregard contrary
evidence unless a reasonable fact-finder could not.  Id.

We must therefore consider
all of the evidence, not just that which favors the verdict.  Id.
 But we cannot weigh witness
credibility issues that depend on the appearance and demeanor of the witnesses,
for that is the fact-finder=s province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the fact-finder=s determinations as long as they are not unreasonable.  Id.
at 573.

If we determine that no
reasonable fact-finder could form a firm belief or conviction that the grounds
for termination were proven, then the evidence is legally insufficient, and we
must generally render judgment for the parent. 
J.F.C., 96 S.W.3d at 266; see Tex. R. App. P. 43.3.

2.     Factual
sufficiency








The higher burden of proof in
termination cases also alters the appellate standard of factual sufficiency
review.  In re C.H., 89 S.W.3d 17,
25 (Tex.
2002); S.B., 207 S.W.3d at 885.  A[A] finding that must be based on clear and convincing evidence cannot
be viewed on appeal the same as one that may be sustained on mere
preponderance.@  C.H., 89 S.W.3d at 25; S.B.,
207 S.W.3d at 885.  We are instructed to
give due deference to the fact-finder=s findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire
record, a fact-finder could reasonably form a firm conviction or belief that
the parent violated subsections D and E of section 161.001(1) and that
the termination of the parent=s parental rights would be in the best interest of the child.  Tex.
Fam. Code Ann. ' 161.001(1)(D),
(E) & (2); In re C.H., 89 S.W.3d at 28.  If, in light of the entire record, the
disputed evidence rises to the level of being clear and convincing so
that a fact-finder could not reasonably have formed a firm belief or conviction
in the truth of its finding, then the evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108.  If we reverse on factual sufficiency grounds,
then we must detail in our opinion why we have concluded that a reasonable
fact-finder could not have credited disputed evidence in favor of its
finding.  J.F.C., 96 S.W.3d at
266-67.

Endangerment Findings








We first review the evidence supporting the trial court=s findings that
appellant (1) knowingly placed or knowingly allowed J.P. to remain in
conditions or surroundings which endangered his physical and emotional
well-being and (2) engaged in conduct or knowingly
placed J.P. with persons who engaged in conduct which endangered J.P.=s physical or emotional well-being. 
Tex. Fam. Code Ann. ' 161.001(1)(D), (E). 








Under section 161.001(1)(D),
the environment of a child must be examined to determine if that is a source of
endangerment    to the child.  Tex.
Fam. Code Ann. '
161.001(1)(D); In re D.T., 34 S.W.3d 625, 632 (Tex App.CFort Worth 2000, pet. denied). 
Under section 161.001(1)(E) of the Texas Family Code, the term Aendanger@ means to
expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at 533.  Accordingly, when analyzing the trial court=s findings under subsection (E), we must determine whether sufficient
evidence exists that the endangerment of the child=s physical well-being was the direct result of the parent's conduct,
including acts, omissions, or failures to act. 
In re D.M., 58 S.W.3d 801, 811-12 (Tex. App.CFort Worth 2001, no pet.). 
Termination under section 161.001(1)(E) must be based on more than a
single act or omission; a voluntary, deliberate, and conscious course of conduct
by the parent is required.  Tex. Fam. Code Ann. ' 161.001(1)(E); D.T., 34 S.W.3d at 634; In re K.M.M.,
993 S.W.2d 225, 228 (Tex. App.CEastland 1999, no pet.). 
However, it is not necessary that the parent=s conduct be directed at the child or that the child actually suffer
injury.  Boyd, 727 S.W.2d at
533.  The specific danger to the child=s well-being may be inferred from parental misconduct standing
alone.  Id.

To determine whether
termination is necessary, courts may look to parental conduct both before and
after the child=s
birth.  D.M., 58 S.W.3d at
812.  As a general rule, conduct that
subjects a child to a life of uncertainty and instability endangers the
physical and emotional well-being of a child. 
In re S.D., 980 S.W.2d 758, 763 (Tex. App.CSan Antonio 1998, pet. denied). 

1.     Appellant=s mental health       

In the present case, TDFPS
points to appellant=s history of
mental  health issues as evidence of
endangering conduct.  A parent=s mental state may be considered in determining whether a child is
endangered if that mental state allows the parent to engage in conduct that
jeopardizes the physical or emotional well-being of the child.  In re J.I.T.P., 99 S.W.3d 841, 845
(Tex. App.CHouston
[14th Dist.] 2003, no pet.); In re C.D., 664 S.W.2d 851, 853 (Tex. App.CFort Worth 1984, no writ). 
Further, threats or attempts to commit suicide may also contribute to a
finding that the parent engaged in a course of conduct that is detrimental to a
child=s physical or emotional well-being. 
See In re A.M.C., 2 S.W.3d 707, 716 (Tex. App.CWaco 1999, no pet.).








The record demonstrates that
appellant had continuously struggled with mental instability, including
suicidal thoughts.  Appellant admitted
that she has schizoaffective disorder and exhibits symptoms which include
schizophrenia  and bipolar
disorders.  During appellant=s pregnancy, she was admitted to CRC two times.  On July 21, 2005, when TDFPS removed J.P.
from appellant, appellant experienced a mental health crisis after giving
birth.  Appellant testified that at that
time, she was taking Abilify, Lamictal, and Lexapro.  She requested that TDFPS investigator Burt
take her to CRC.  Appellant told Burt
that J.P. could not accompany her, and it was at that point that Burt removed
J.P.  Thus, appellant voluntarily
relinquished possession of her child so that she could seek emergency medical
help.  CRC told her that she had
postpartum depression.  Although
appellant=s mental
condition at that time could have endangered J.P., she voluntarily chose to
place him in a safer environment; J.P. was never back in appellant=s care after July 21, 2005.








In August 2005, appellant
told Johnson that a drug lord named Aaron Brown was after her and her friend
Rhonda.  Appellant allowed Rhonda to stay
with her for a brief time.  Appellant
told Johnson she had to start smoking and disguise her appearance to hide from
this drug lord.  However, appellant
testified at trial that at the time she made those statements, she was still
adjusting to her medication, and she was exhibiting psychotic behavior.  She stated that none of what she said
regarding Brown was true and that she had been delusional.  Appellant later told Johnson that she was
mistaken that Brown was a drug lord who was after her.  Johnson also testified that appellant told
her that Brown was going to be J.P.=s godfather.

On May 29, 2006, appellant
was between doctors and trying to obtain her court-ordered counseling when she
made what she described as a flippant remark to someone at CRC about slitting
her wrists.  CRC took her comment as a
suicide threat, and appellant was taken to the state hospital under a
court-ordered commitment.  The hospital
released appellant twenty-nine days later. 








The evidence showed that
although appellant had been hospitalized on numerous occasions after learning
of her mental difficulties at age twenty, she had always sought help when her
medication was not working or when she was having trouble.  Appellant had not done drugs, nor did she
drink alcohol because she feared it would interfere with her medication.  Appellant complied with random drug testing
as part of her service plan, and Johnson testified that she did not believe
appellant was doing any illegal drugs. 
In fact, Johnson stated that appellant had sought help from mental
health professionals and complied with all of her counseling requirements.  Appellant stated that if she had another
episode like she did after J.P.=s birth, she would not hesitate to call TDFPS because she would call
TDFPS on herself rather than hurt her child. 
Additionally, no doctor testified at trial regarding appellant=s mental health problems. 
Furthermore, TDFPS did not claim that appellant failed to comply with
the counseling portion of her service plan. 
Moreover, appellant never threatened to harm J.P.; in fact, she
voluntarily relinquished him so that she could seek treatment.       

2.     Appellant=s living conditions








Regardless, TDFPS also points
to appellant=s living
conditions as evidence of endangering conduct. 
When Burt initially visited appellant=s home on Carolina Street
,
she found the smell nauseating because of the strong odor of cat urine.  Additionally, she found cat feces smeared on
the floor.  Burt also observed piles of
clothing and other clutter throughout the house but did not see any baby
equipment.  Appellant testified at the
hearing that before she gave birth, she did not have much strength, and D.P.,
J.P.=s father who was living with appellant at that time, did not help her
maintain or clean their home. Appellant stated that he did not clean the litter
box, that he continually brought his friends over, and that they trashed the
place.  Appellant, however, slowly got
her house in order.  Appellant stated
that when Burt returned to appellant=s apartment on Carolina
 Street on July 20, 2005, the house was Aspotless@; the dishes
were washed, the floor swept and mopped, and the cat was out of the house.  Appellant said she even got rid of her cat
for a while.  However, Burt testified
that the home was better but not spotless. 
Burt also stated that the clutter in the front room had been removed and
that she did not notice any animal feces on the floor.  Despite the improvements, Burt did not
believe the conditions of the home were appropriate for the child.  When she considered the conditions of the
home along with appellant=s mental
condition and her behavior, Burt thought that appellant was endangering J.P.   

Between July and October
2005, Johnson also visited appellant=s home on Carolina Street
three times.  She testified that each
time she visited, the home smelled of cat urine and found that there was
clutter everywhere. Johnson stated at one visit, she found mud on the stairs
and the upstairs fire escape locked.








However, at the time of the
hearing, appellant had moved back into her mother=s house on Blairhouse
 Road
.[4]  Appellant=s sister was no longer living at her mother=s home.  Appellant testified
that she wanted to look for an apartment after her finances were better.  She also said she wanted her mother to move
with her, but her mother had been in that house for a long time.  Her mother=s home had three bedrooms. 
Appellant had repaired a broken window in the back room, installed
childproof mechanisms, and obtained a crib, clothes, and toys for J.P.  Between August and December 2006, Johnson
found appellant=s home on Blairhouse Road to
be clean, safe, and sanitary. 

Although TDFPS argued that it
was too soon to determine whether appellant could maintain a clean living
environment, appellant had moved out of her home on Carolina Street and into her mother=s home on Blairhouse Road
,
which TDFPS determined was clean, safe, and sanitary.  In fact, Johnson admitted that the home on Blairhouse Road was
adequate for a child=s needs and
that the home was consistently clean and neat when TDFPS visited.

3.     Appellant=s service plan








TDFPS also contends that
appellant did not work her service plan because she had not demonstrated
age-appropriate parenting skills, maintained a budget, or chosen friends and
associates carefully.  The status hearing
order, however, from October 26, 2006, stated that appellant had Ademonstrated adequate and appropriate compliance with the service
plan.@  The record indicates that
appellant had difficulty demonstrating age-appropriate parenting skills
although appellant did complete her parenting classes, which were required by
her service plan.  For example, on one
occasion, when appellant slapped J.P.=s hand, she became defensive when Johnson advised her not to hit J.P.=s hand and when Johnson attempted to give appellant child development
information.  Johnson, however, testified
that she did not witness the slapping incident firsthand and confronted
appellant about the incident six days later. 
Matlock,
a case supervisor for the local CASA branch, stated that appellant was anxious
and paced while holding the baby, and Matlock feared appellant would drop
J.P.  Matlock also testified that during
one visitation, appellant was changing J.P.=s diaper and he
began urinating, and appellant just laughed instead of covering it up or trying
to clean up the mess.  Appellant admitted that she was told not to put her finger in J.P.=s mouth after she changed his diaper. 
The record also indicates that appellant had trouble appropriately
feeding J.P.  Caseworker Johnson stated
that appellant would put a bottle in J.P.=s mouth and then pull it out, causing him to be fussy and cranky.  On another occasion, appellant attempted to
feed J.P., but after becoming frustrated, she threw the jar of baby food in the
trash can.  Later, appellant again tried
to feed J.P., and Matlock believed that appellant had retrieved the jar out of
the trash can.

Appellant testified that she
completed her parenting classes and learned that the best way to discipline
children is through taking away privileges. Appellant also read the books What
to Expect the First Year and Parenting for Dummies, which were
recommended by her caseworker.  In May
2006, appellant admitted that she brought a pocket knife to her visitation with
J.P. but that she gave the knife to the lady behind the counter.








Appellant regularly visited
J.P. and maintained significant contact with her son.  Appellant participated in her weekly visits
with J.P. during the seventeen months he had been in foster care, which was
approximately seventy visits. Appellant stated she missed only one or two
visits with J.P. that were not related to illness.  She also stated she thought she was late or
left early once or twice although she did admit that she sometimes had problems
with transportation.  For example, on
August 17, September 14, and September 25 of 2006, appellant was seven to ten
minutes late because of transportation problems.  On September 21, appellant called and
canceled her visitation after her visitation hours had started.  Appellant testified that during some visits
she would sleep but would wake up if she heard J.P.=s voice.








The evidence shows that
appellant made most of her visits with J.P. and that she and the child had
significant contact.  Additionally,
Johnson stated that appellant had participated in her visitations as best she
could.  Appellant=s service plan also required her to demonstrate her ability to save
and maintain a budget.  Although
appellant, at times, had difficulty paying her rent, at the time of the
hearing, she had secured a job as a cashier at Wal-Mart.  Before working at Wal-Mart, appellant had a
hard time obtaining a job because of her lack of work history due to her mental
health issues.  Appellant tried having a
booth at Corner Emporium; she also did some groundskeeping at Hawk Ridge Golf
Course but was laid off because she got heatstroke.  Appellant, however, never gave TDFPS any
paperwork indicating that she held these jobs for more than one month.  In 2001, appellant got a job as a data entry
specialist, which she kept for a few months until her computer broke.  Appellant was also taking correspondence classes
to learn to become a medical coder. 
Furthermore, appellant was on disability and received Social
Security.  Appellant had also purchased a
car two weeks before the termination hearing. 
Thus, the evidence shows that at the time of the hearing appellant had
found a job, purchased a car, and was in the process of becoming financially
secure. 

Appellant=s service plan also required her to choose friends and associates
carefully and to provide information to her caseworker regarding people staying
in her home.  Johnson testified that
appellant had not complied with this part of the service plan.

The evidence showed that
appellant had a history of unstable relationships.  She married Timothy Collins in 1998 and
divorced him after two months of marriage because he was psychologically
abusive and controlling.  Appellant
married Robbie Wilson in 1999 and divorced him a year later because he was
physically abusive. 








Appellant initially met D.P.,
J.P.=s father, in the summer of 2004. Appellant saw D.P. again in October
at a friend=s house, and
they began dating around Thanksgiving. 
D.P. told appellant that he had children who lived with his parents and
that he could contact them through the Internet.[5]  Appellant did not know D.P. was married until
after she became pregnant.  D.P. lived
with appellant at the Housing Authority.[6]  Another man named Josh Cheadle also lived
with them.  Cheadle would help out with
groceries.  Appellant testified that in
October 2005, after D.P. had moved out, he came over to her apartment and raped
her. 








At the beginning of 2006,
appellant met Garry Jones by a Walgreens near Sacred Heart Catholic
Church.  They dated for three weeks, and
appellant told Johnson that she and Jones were going to get married in
March.  Appellant gave Johnson Jones=s date of birth and Social Security number.  Appellant also told Johnson she might be
pregnant, but she was not.  Appellant
told Johnson that Jones was going to move in with her and her mother after they
were married.  Appellant informed Johnson
that Jones had been diagnosed with dementia as a child, had been in juvenile
detention, was on Seroquel and Zoloft, had been in the state hospital three
times, and had petitmal seizures but did not take his medication.  Appellant later told Johnson that Jones=s mental health problems were too severe, so she broke up with him and
that they were just friends.  Appellant
testified that she did not know Jones had been convicted of several crimes,
including felony theft and misdemeanor criminal trespass, or that he had been
in prison.

In early 2006, appellant also
went out on a date with her neighbor Victor Rice whom she had known since
2004.  Rice repeatedly asked appellant to
marry him, but she had always refused. 
After their date, she agreed to marry him but then backed out the next
day.  Appellant told Johnson in February
2006 that she cut off her friendship with Rice and that she had to call the
police on him. 








Appellant met Corey Mack in
March 2006 on a city bus, and they began dating in April.  Mack helped appellant set up her booth at the
Corner Emporium.  Mack also rode with her
to visitations with J.P. but did not go in with her to the visits.  Appellant broke up with Mack because he was
bipolar and refused to take his medicine. 
Appellant also met Maurice Grange on a city bus in 2005, and they
dated.  Appellant stated Grange also had
mental health issues, so she broke up with him; he disappeared.  Grange reappeared after J.P. was born and wanted
to date appellant again.  Appellant saw
him a few times, but when he began acting strangely, she threatened to call the
police and he disappeared again. 
Caseworker Johnson testified that appellant told her that she was going
to marry Grange.  Appellant also has a
friend named Chris Wright, but they never dated.  Appellant and Wright have been friends since
1998.  Wright had the same mental health
diagnosis as appellant, but he was also diabetic.

In November 2006, appellant
met a man named Leon from Tennessee on the
Internet, and they talked for a couple of weeks on the phone.  Appellant stated that Leon had asked
her to marry him: she thought that was weird, so she quit talking to him.  Appellant had chatted with a couple of other
men online.

Appellant most recently dated
Jimmy Howells.  Appellant testified that
they did not have a relationship but that they just saw each other for a couple
of weeks although she had known him for five years.








Appellant provided TDFPS with
several possible placements for J.P. Appellant suggested Jesse Barns, the son
of appellant=s friend Joy
Amyx, as a possible placement.  Barns,
however, had an extensive criminal history including injury to a child.  Appellant stated that she did not know about
his criminal history when she suggested Barns as a placement but did not want
him as a placement after she learned about his background.  Appellant also wanted Myra Brown to babysit,
but Brown had convictions for theft and criminal trespass.  In 2004, appellant met Sandra Benton.  During the months of November and December
2005, appellant learned Benton
was homeless; appellant allowed her to be placed on appellant=s lease and stay with her.  Benton also had a
criminal history that included a felony prosecution for tampering with a
government record and theft.  Appellant
stated that she had let people live with her because they were homeless during
the holidays but that she would not do that again.  Appellant testified that she is not seeking a
relationship with anyone and that she does not keep friends with a criminal
record and refuses to bring them around her son. 

The record shows that
appellant had numerous unstable relationships and friendships with various
people, some of whom had criminal records. 
D.P.  lived with appellant at the
time J.P. was born, but the evidence is not clear regarding when he moved
out.  Thus, there is no evidence that any
of these relationships influenced or affected J.P. or that appellant would
continue this type of behavior if J.P. were living with her.

Analysis








We first address whether the
evidence is legally sufficient to support the finding that appellant (1)
knowingly placed or knowingly allowed J.P. to remain in conditions or
surroundings that endangered his physical or emotional well-being and (2)
engaged in conduct or knowingly placed the child with persons who engaged in
conduct which endangered his physical or emotional well-being.  Tex.
Fam. Code Ann. '
161.001(1)(D), (E). 

Here, the record contains
some evidence concerning appellant=s history of mental instability. 
In addition, the record shows that there is some evidence that appellant
failed to maintain a clean living environment suitable for J.P.  because of the nauseating cat odor and
continual clutter that filled her apartment. 
Furthermore, there is some evidence that appellant did not demonstrate
appropriate parenting skills, maintain a financial budget, or choose her
friends and associates with caution. 
Viewing all the evidence in the light most favorable to the judgment, we
hold that the evidence is legally sufficient to support termination under
either subsection (D) or (E), and we overrule the part of appellant=s first issue complaining about the legal sufficiency of the evidence
to support the termination of her parental rights to J.P. 

We next address whether the
evidence is factually sufficient to support the finding that appellant (1) knowingly
placed or knowingly allowed J.P. to remain in conditions or surroundings that
endangered his physical or emotional well-being and (2) engaged in conduct or
knowingly placed the child with persons who engaged in conduct which endangered
his physical or emotional well-being.  Id. 








Viewing the evidence in a
neutral light, we hold that while the evidence suggests that appellant=s chronic mental health problems may have potentially created a risk
to J.P., the evidence regarding her history of mental instability did not rise
to the level of endangerment when considered in context with the other evidence
in the record.  Although the evidence
showed that appellant had mental health issues, the evidence also demonstrated
that she was aware of her condition and had sought treatment when she needed
assistance, particularly when she considered J.P.=s needs after his birth. 
Additionally, although appellant had been to CRC twice during her
pregnancy, she had not been to CRC since J.P was removed in July 2005.  In May 2006, appellant was admitted to the
state hospital after making a remark about cutting her wrists in an attempt to
obtain her court-ordered counseling.  But
there is no evidence contradicting appellant=s testimony that the remark was flippant nor is there any evidence
that she was, in fact, suicidal at that time or that she had threatened J.P. in
any way.  Moreover, TDFPS did not call a
doctor to testify concerning appellant=s mental instability.  Also,
there is no evidence that appellant=s mental condition harmed J.P.








In addition, although the
evidence showed that appellant=s living conditions on Carolina
 Street were unsuitable for J.P., at the time of
the hearing, appellant lived with her mother on Blairhouse Road
, and TDFPS admitted that
the home was clean, safe, and sanitary.

Furthermore, despite evidence
that appellant=s parenting
skills were inadequate, appellant had completed parenting classes, maintained
significant contact with J.P. by attending weekly visitations, and secured a
job so that she could financially provide for her child.  Moreover, while appellant had had many
unstable relationships in the past, there is no evidence that J.P. was present
when these persons were with appellant, nor is there any evidence of whether
these relationships affected J.P. or appellant=s relationship with J.P. 
Although there may have been a potential endangering situation regarding
appellant=s tendency
to invite questionable people into her home, there was no testimony at trial
indicating such a situation.  The record
failed to show any evidence of harm or injury to J.P.; in contrast, the
evidence indicated J.P. was a happy, healthy baby.

Considering the evidence in a
neutral light, we hold that the evidence is factually insufficient to support
termination under subsection (D) or (E). 
We sustain the part of appellant=s first issue challenging the factual sufficiency of the evidence to
support the termination of her parental rights to J.P.








Because we have concluded
that the evidence is factually insufficient to support termination under family
code section 161.001(1)(D) or (E), we do not address whether termination was in
J.P.=s best interest, appellant=s second issue.  See Tex. R. App. P. 47.1.

Furthermore, we note that
section 161.003 of the family code provides an alternate method to terminate
parental rights if a parent has a mental or emotional illness.  Tex.
Fam. Code Ann. ' 161.003.
Section 161.003 states:

(a)
The court may order termination of the parent-child relationship . . . if the
court finds that:

 

(1) the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to
provide for the physical, emotional, and mental needs of the child;

 

(2) the illness or deficiency, in all reasonable probability,      proved by clear and convincing evidence,
will continue to render the parent unable to provide for the child=s
needs until the 18th birthday of the child;

 

(3) the department has been the temporary or sole managing       conservator of the child of the parent for
at least six months preceding the date of the hearing on termination held in
accordance with Subsection (c);

 

(4) the department has made reasonable efforts to return the       child to the parent; and

 

(5) the termination is in the best interest of
the child.

 

(b)
Immediately after the filing of a suit under this section, the court shall
appoint an attorney ad litem to represent the interests of the parent against
whom the suit is brought.

 

(c) A
hearing on the termination may not be held earlier than 180 days after the date
on which the suit is filed.

 








(d)
An attorney appointed under Subsection (b) shall represent the parent for the
duration of the suit unless the parent, with the permission of the court,
retains another attorney.

 

Id.








Thus, to terminate under this
section, TDFPS must prove additional elements not required under section
161.001(1)(D) and (E).  Id. '' 161.001(D), (E), 161.003.  For example, TDFPS must prove by clear and
convincing evidence that the mental illness will render the parent unable to
provide for the child=s needs
until the child is eighteen years old, and TDFPS must make reasonable efforts
to return the child to the parent.  Id. ' 161.003(a)(2), (4).  Here,
there is no evidence that appellant=s mental health problems would render her unable to care for J.P.  Additionally, TDFPS did not make reasonable
efforts to reunite appellant and J.P.  In
this case, TDFPS must have recognized appellant=s stability because it did not proceed to terminate her parental
rights under section 161.003.  TDFPS
admitted that appellant was not faking her mental illness, yet it did not
attempt to terminate her parental rights under the more stringent mental
illness section of the family code. 
Furthermore, no doctor or mental health professional testified regarding
appellant=s mental
health.  If, as TDFPS claims, appellant=s mental health issues are detrimental to J.P.=s physical and emotional well-being, TDFPS could have sought
termination under section 161.003.  While
TDFPS was not required to file this case under section 161.003, when a parent
suffers from a mental illness, section 161.003 may be more appropriate.  See In re B.L.M & J.L.M., Jr., 114
S.W.3d 641, 648 (Tex.
App.CFort Worth 2003, no pet.).

Although the dissent
discusses the same facts that we have reviewed regarding the sufficiency of the
evidence on endangerment in the context of its best interest discussion, the
dissent never explains why it believes that the evidence is factually
sufficient to prove endangerment.  After
reviewing all of the evidence under the appropriate standard of review, we
believe that our conclusion is correct: that the evidence is factually
insufficient to prove the endangerment grounds. 
Thus, we do not reach the appellant=s second issue, the best interest issue because, based on our holding
on the endangerment grounds, we must reverse and remand for a new trial
regardless.

Conclusion

Having determined that the
evidence is factually insufficient to support the judge=s findings under family code section 161.001(1)(D) and (E), we reverse
the trial court=s judgment
and remand for a new trial.

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL B:   LIVINGSTON,
WALKER, and MCCOY, JJ.

 

MCCOY, J. filed a
dissenting opinion.








DELIVERED: February 4,
2008

 

 



 

 

 

 

 











 
 
 
 
 
 
 




                                                                                                        

 

 

 

 

 

                                COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT WORTH

 

                                        NO.
2-07-026-CV

 

IN THE INTEREST OF
J.P., MINOR CHILD

                                                                                                        

                                              ------------

 

          FROM COUNTY COURT AT LAW NO. 2 OF WICHITA COUNTY

 

                                              ------------

 

                      DISSENTING
MEMORANDUM OPINION

 

                                              ------------

I respectfully dissent.  Based on the appropriate standard of review
as articulated in the majority=s opinion and considering the evidence in a neutral light, I would
overrule Appellant=s issues
challenging the legal and factual sufficiency of the evidence to support the
termination of her parental rights, as that evidence is set forth in the
majority=s opinion, and would therefore reach the question of whether
termination was in the best interest of J.P. 


All parties agree that the
Texas Supreme Court has articulated the factors to consider regarding the Abest interest@ in a
termination case in Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.
1976).  Those nonexclusive factors  include the following: 








(1)
the desires of the child;

 

(2)
the emotional and physical needs of the child now and in the future;

 

(3) the emotional and physical danger to the child now and in the 

future;       

 

(4)
the parental abilities of the individuals seeking custody;

 

(5)
the programs available to assist these individuals to promote the best interest
of the child;

 

(6)
the plans for the child by these individuals or by the agency seeking custody;

 

(7)
the stability of the home or proposed placement;

 

(8)
the acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper one; and

 

(9)
any excuse for the acts or omissions of the parent.

 

Id. at 372.

These factors are not
exhaustive; some listed factors may be inapplicable to some cases; other
factors not on the list may also be considered when appropriate.  In re C.H., 89 S.W.3d 17, 27 (Tex. 2002).  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.  Id.  On the other hand, the presence of scant
evidence relevant to each factor will not support such a finding.  Id.








I. 
The Holley Factors

Applying the evidence to the Holley
factors yields the following:  

(1) The Desires of the Child

TDFPS asserts that both
Appellant and TDFPS agreed that the child was unable to express his desires due
to his age. 

Appellant responds that there
is no testimony as to the desires of the child in this case, and given J.P.=s tender years, the testimony would be scarcely credible even had it
been given.  Appellant does not believe
that under the record there are any facts she can point to that would show that
J.P. favors either her or TDFPS=s position.

(2) The Emotional and Physical Needs of
the Child Now and in the Future








TDFPS asserts that Appellant=s parenting record includes (1) Appellant=s slapping J.P.=s hands, (2)
Appellant=s having
problems feeding J.P., (3) Appellant=s having problems recognizing J.P.=s proper emotional responses, (4) Appellant=s retrieving a jar from a trash can and feeding J.P. from it, (5)
Appellant=s arguing
with TDFPS personnel after being requested not to stick her finger in J.P.=s mouth after changing his diaper, (6) Appellant=s acting anxious and pacing, and being more interested in talking to
other parents than visiting with J.P., and (7) Appellant=s falling asleep during visits with J.P.  Caseworker Johnson and CASA supervisor
Matlock testified that Appellant had not learned proper parenting techniques
for J.P. Johnson stated that she did not believe Appellant could raise the
child because of her mental limitations and emotional and psychological
limitations.  Johnson testified that she
had concerns over Appellant=s past poor choices, continued psychological difficulty, her ability
to learn the right procedures and transition among J.P.=s stages, and basically age-appropriate parenting.

Appellant asserts that she
testified that she may be better equipped to handle any mental health issues
J.P. might have because of her own experiences. 
Appellant further testified that she had adequate parenting skills and
could learn more and that she would be able to address J.P.=s physical and psychological needs now and in the future.

However, Johnson and Matlock
testified to specific examples of Appellant=s inability to care for J.P.  Both
stated that despite attending parenting classes, Appellant was unable to
translate anything she had learned into actual use.  Regarding Appellant=s contention that she could assist J.P. should he require mental health
treatment, TDFPS points out that she herself did not follow through with mental
health issues and had not achieved stability in her own mental health needs.








Appellant responds that J.P.
needs what all children needClove and a roof over their headsCand that TDFPS stated that as of the date of trial, Appellant=s mother=s house was
adequate to meet J.P.=s needs. 

(3) The Emotional and Physical Danger to
the Child Now and in the Future








TDFPS asserts that Appellant
testified to numerous mental health crises and mental hospitalizations during
the pendency of the case and stated that she had threatened suicide Amany@ times in
the past.  Further, Appellant permitted
various individuals with criminal records to reside at the home, even after
Appellant informed Johnson that she had found drug paraphernalia in her home
from J.P.=s father
while she was pregnant.  Caseworker Burt
stated that upon her second visit to the residence there were several persons
there, including the child=s father, who was not a viable placement because of his extensive CPS
history.  Appellant refused to believe
Burt when advised of the child=s father=s CPS
history.  Appellant admitted to
suggesting Jesse Barns, an individual with a criminal history, as a placement
for J.P.  Appellant testified that she
has permitted several dangerous individuals to live with her after J.P.=s removal.  Appellant permitted
Rhonda, whose last name she did not know, to move in with her in August
2005.  At that time, Appellant began
having a series of delusions, believing that Aaron Brown, yet another
individual with a criminal history, was a danger to her because Rhonda was
living with her.  She admitted to
permitting Sandra Benton, an individual with a criminal history, to live with
her in late 2005 and attempting to help Benton
get on Appellant=s
lease.  Appellant displayed no stability
for the child as she received several eviction notices due to nonpayment of
rent during the case.

Appellant responds that at
the present time, with J.P. being in TDFPS-approved foster care, there is no
imminent danger to the child and that there is no evidence that J.P. would be
in any danger with her either.  Johnson
said that Appellant=s
accommodations at the time of the trial were acceptable to TDFPS and that TDFPS
had no objection to Appellant=s plans to stay in the house, so there was no present or future Aphysical danger@ to the
child.  As to the present or future Aemotional danger@ to J.P.,
Appellant agreed that under the record that is a closer call, but at the time
of trial, no one from TDFPS was questioning Appellant=s competence or her ability to hold a job. 

(4) The Parenting Ability of the Individual
Seeking Custody








TDFPS asserts that, as
Appellant points out, the nurses at the hospital had concerns regarding
Appellant=s ability to
parent.  As mentioned above, Johnson and
Matlock testified to specific examples of Appellant=s inappropriate parenting. 
Johnson testified that she had seen nothing in the eighteen months of
the case to indicate that Appellant=s parenting abilities had improved. 
Both Johnson and Matlock stated that termination would be in the child=s best interest.

Appellant responds that the
record is barer than one would hope it would be.  Essentially, the child was taken from his
mother when he was two weeks of age and had been in the care of TDFPS ever
since. 

(5) The Programs Available to Assist the
Individual Seeking Custody

TDFPS asserts that Johnson
testified that Appellant did not demonstrate the parenting skills that were
taught in the parenting classes offered to her. Matlock stated that Appellant
did not demonstrate appropriate parenting in the visitations and that Appellant
had not learned from her parenting classes. 

Appellant alleges that by
availing herself of government benefits, this factor weighs in her favor
because a firm belief or conviction could not be formed that there were not
programs available to her, nor that she would not use such programs.  The only programs mentioned in relation to
the child were WIC and Medicaid. 
Appellant responds that the record was extensive on this point, and
Appellant was able to catalogue the benefits she already received.  Appellant has previously availed herself of
government benefits and will continue to do so in the future if her needs
require it and if the government allows it. 









However, Appellant presented
no evidence of her efforts to begin either program, nor did she present
evidence of her attempts to find any others. 

(6) The Plans for the Child by the
Individual or by the Agency Seeking Custody

TDFPS asserts that Appellant
wants to remain J.P.=s
mother.  Appellant also stated that she
wanted to teach J.P. the value of work and faith.

However, Appellant gave no
concrete details of specific plans or actions she intended to undertake in
order to secure J.P.=s return and
to meet his needs.  TDFPS urges that the
trial court was entitled to infer that Appellant=s future actions would be adverse to J.P. after her recommendation of
Jesse Barns, an individual with a conviction for injury to a child, as a
placement for the child.

Appellant responds that there
is no controversy here and that she wants to be the mother of her child.  TDFPS wants the child to be adopted but not
by the foster family.  Under either plan,
there will be a parent or parents for the child; but under Appellant=s plan the parent actually gets to be a parent, whereas under TDFPS=s plan, a strangerCliterally a stranger to the childCwill get to be a parent.

(7) The Stability of the Home or Proposed
Placement













TDFPS asserts that Johnson
testified that Appellant had not demonstrated any stability and that she had
concerns for Appellant=s ability to
provide the child with a safe environment. 
In addition, Appellant testified to the multiple unstable relationships
that she had been involved in.  Appellant
chose to become engaged to Corey Mack, an individual with a history of family
violence.  Appellant also testified
regarding the numerous individuals with criminal records whom she permitted to
live in her home, even during the pendency of the case.  Appellant displayed no job stability or
residential stability as she received several eviction notices during the
pendency of the case.  Matlock testified
that she did not believe Appellant had learned coping skills from her
counseling.  Appellant failed to show
that her present residential stability would continue in the future.  Appellant advised Johnson that she was
considering moving out of her mother=s house as recently as December 2006. 
During the case, Appellant was unable to pay her rent and severely
overdrew her checking account, causing concern about her ability to handle her
finances.  Despite this financial
mismanagement, Appellant discussed internet service at trial.  TDFPS contends that the need for Appellant=s stability is not limited to a physical residence; it encompasses the
entire environment the child will be exposed to, physically and
emotionally.  Appellant did not show that
she was able to make rational and stable decisions for the child=s case.  In addition, an
adoptive placement is not a prerequisite to finding that a parent has committed
one of the grounds for termination and that termination is in the child=s best interest.  KilpatrickBLusk v. Tex. Dep=t of Family & Protective Servs., No.
03-05-00548-CV, 2006 WL 3329431, at *2 (Tex. App.CAustin Nov. 16, 2006, no pet.) (mem. op.).

Appellant argues that her
current home is stable.  She further
contends that TDFPS cannot prove its placement is more stable because there has
not been an adoptive home found yet. 

Appellant admits to having
many friends and admits that not all of those friends were or are everything
one would hope them to be.  But as far as
the home goes, Appellant=s current
homeCher mother=s trailerCwas and has been acceptable to TDFPS. 
Appellant said she has a stable home, and so, presumably, the next one
will also be. 

(8) Acts or Omissions Which May Indicate
the Parent-Child Relationship Is Not Proper








TDFPS asserts that Appellant=s contentionCthat her
acts or omissions were Atrivial in
nature@ because no one has suggested the child was injured in her homeCdownplays her poor parenting skills, stating that two weeks is not
much time to learn how to be a parent. 
Finally, Appellant argues that she sought help from TDFPS and that she
sought to eradicate her weaknesses rather than amplify them.  Appellant=s refusal of mental health care does not indicate an attempt to Aeradicate@ the
issue.  Appellant refused to believe Burt
when advised about the child=s father=s CPS
history, even though she later admitted to his bringing drug paraphernalia into
her residence.

Appellant responds that she
had acquaintances with inadequacies, but that is neither a crime nor
particularly unusual.  Although she was
not frugal with her money, people in bankruptcy get to keep their babies.  She did not exhibit solid parenting skills,
but Atwo@ weeks is
not much time to learn how to be a parent. 


TDFPS responds that Appellant
did not have just two weeks to learn how to parent this child; she had the
entire pendency of the case, which was over a year.  After a year of visits and a year of classes
and assistance, Appellant still was unable to parent J.P.  








Appellant further urges that
the only physical Aact or
omission@ that the State had against Appellant as a justification for taking
J.P. was that she had two cats, a dirty cat box, a mildly cluttered apartment,
and that she lacked consumer perfection in her acquisition of infant care
preferences.  As for a psychological Aact or omission,@ she had a
temporary psychic dislocation, an episode for which she recognized and sought
help from TDFPS.  Appellant=s Aacts and
omissions@ were
trivial in nature, and the best indication of their fundamental triviality is
that no one has said or suggested that J.P. in any way suffered from being in a
smelly home with a semi-lucid mom eighteen months ago.  In fact, no one, she argues, suggested that
the child in any way suffered from his association with an admittedly flawed
individual. 

(9) Excuses for The Parent=s Acts or Omissions

Appellant asserts that she
has a mental illness that Ashe did not ask for.@ She alleges that she has as meritorious an excuse as possible (mental
illness) but argues that there must be a bad act before an excuse is
necessary.  She goes on to state that she
will not ask forgiveness when she did nothing wrong. 

TDFPS responds that Appellant=s mental illness may be an excuse, but her refusal of treatment was
not.  Even at trial, Appellant had no
concept as to why J.P. was removed from her care.  Appellant cannot see that her conduct and her
actions endangered, and would continue to endanger, J.P.  Appellant has no excuse for her refusal to
address her mental health issues and her refusal to accept her role in the
child=s removal.

II. 
Summary

Viewing all the evidence in
the light most favorable to the judgment, I would hold that the evidence is
legally sufficient to support the trial court=s finding that termination of Appellant=s parental rights was in J.P.=s best interest.  See Tex. Fam. Code Ann. ' 161.001(2) (Vernon
Supp. 2007).  

 

 








                                          III.  Conclusion

For the foregoing reasons, I
respectfully dissent and would affirm the trial court=s judgment.

 

BOB
MCCOY

JUSTICE

 

DELIVERED: February 4,
2008











[1]See Tex. R. App. P. 47.4.





[2]Burt=s
testimony indicates that appellant allowed Burt to take J.P. because she was
aware that he could not go with her to CRC. 
Appellant testified that her memory on July 21, 2005, was Afuzzy,@ and
she did not recall Burt telling her why J.P. was being removed. 





[3]The
trial court had previously terminated the parental rights of D.P., J.P.=s
father, and severed that case into a separate cause number on November 22,
2006.





[4]The
record does not indicate when appellant moved back in with her mother.





[5]TDFPS
investigator Burt testified that D.P. had a history with TDFPS and that his
parental rights to his four children had been terminated.





[6]The
evidence shows that D.P. lived with appellant at some point, but the record
does not indicate when he moved out or why.